1

2

3

4

5

6

7

8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  JOSEPH S. SCHOENHOEFT,                    CASE NO. CV-F-03-5545 DLB HC

12                        Petitioner,          ORDER DENYING PETITIONER'S
                                               PETITION FOR WRIT OF HABEAS
13          vs.                                CORPUS

14  DARREL ADAMS, WARDEN,                      [Doc. 43]

15                        Respondent.

16  _____/

17

18       Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to

19  28 U.S.C. § 2254.  Petitioner is represented by Charles M. Bonneau, Esq.  Pursuant to 28 U.S.C. §

20  636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

        BACKGROUND[1]

21       On July 18, 2000, following a court trial, Petitioner was guilty of kidnaping with the intent to

22  commit sodomy (Cal. Pen. Code § 209(b)),[2] kidnaping (§ 207), forcible sodomy (§ 286(c)), forcible

23  oral copulation (§ 288a(c)), assault with a deadly weapon (§ 245(a)(1)), and two counts of attempted

24  murder (§ 664/187).  Petitioner is serving a sentence of twenty-five years to life, plus thirty-four

25

26  ─────────────────

27       [1] This information is derived from the third amended petition, Respondent's answer to the petition, and Petitioner's
     traverse.

28       [2] All further statutory references are to the California Penal Code unless otherwise indicated.

1

1    years.  (CT 306-310.)[3]

2         Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth Appellate

3    District. (Respondent's Lodged Doc. No. 1.)  On May 23, 2002, the Court of Appeal ordered the

4    indeterminate term imposed for count four stricken, and the matter was remanded for resentencing

5    on that count and correction of the abstract of judgment.  The judgment and conviction was affirmed

6    in all other respects.  (Lodged Doc. No. 4.)

7         On June 29, 2002, Petitioner filed a petition for review with the California Supreme Court,

8    which was denied on August 28, 2002.  (Lodged Doc. No. 5.)

9         Petitioner filed the instant petition for writ of habeas corpus on May 1, 2003.  (Court Doc. 1.)

10        On June 23, 2003, Petitioner filed an amended petition for writ of habeas corpus.  (Court

11   Doc. 3.)

12        On August 19, 2003, the undersigned issued an order to show cause why the petition should

13   not be dismissed for lack of jurisdiction.  (Court Doc. 4.)

14        Petitioner filed a second amended petition on September 17, 2003.  (Court Doc. 5.)

15        On December 3, 2003, Respondent filed a motion to dismiss the petition as containing both

16   exhausted and unexhausted claims.  (Court Doc. 9.)  On February 11, 2004, Petitioner filed an

17   opposition to the motion to dismiss.  (Court Doc. 13.)   On February 23, 2004, the undersigned

18   issued a Report and Recommendation recommending that Petitioner's request to hold the petition in

19   abeyance be denied and Respondent's motion to dismiss be granted.  (Court Doc. 14.)

20        On March 22, 2004, Petitioner filed another amended petition for writ of habeas corpus and

21   request to the hold the petition in abeyance.  (Court Doc. 16.)

22        On April 27, 2004, the undersigned vacated the Report and Recommendation of February 23,

23   2004, and granted Petitioner's request to the petition in abeyance until the California Supreme Court

24   issued its ruling or until September 1, 2004, whichever occurred earlier.  (Court Docs. 19, 20.)

25        On June 29, 2004, Petitioner filed a petition for writ of habeas corpus with the California

26   Supreme Court.  (Lodged Doc. No. 6.)

27

28       [3] "CT" refers to the Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal.

1        On June 30, 2004, Petitioner filed a status report. (Court Doc. 21.)

2        On September 16, 2004, the undersigned directed Respondent to file a response to the

3    petition.  (Court Doc. 23.)

4        On September 17, 2004, Petitioner requested this Court to extend the stay.  (Court Doc. 24.)

5    On September 28, 2004, the undersigned granted Petitioner's request to extend the stay, and ordered

6    Petitioner to notify the Court of the ruling issued by the California Supreme Court.  (Court Doc. 27.)

7        On July 20, 2005, the California Supreme Court denied the habeas petition.  (Lodged Doc.

8    No. 7.)

9        On September 28, 2005, Petitioner filed a third amended petition for writ of habeas corpus

10    with this Court.  (Court Doc. 43.)

11        Respondent filed an answer to the third amended petition on December 5, 2005, and

12    Petitioner filed a traverse on December 28, 2005.  (Court Docs. 45, 48.)

13        STATEMENT OF FACTS[4]

14        **GUILT PHASE EVIDENCE**

15        On Saturday morning of Thanksgiving weekend, November 28, 1998, four children were

16    playing basketball on the playground at Fairmont School on Shields Avenue in Sanger: "John Doe

17    1"[5] who was eleven years old; his older sister, Nou, who was about fifteen or sixteen years old; his

18    younger brother, John; and the siblings' cousin, "John Doe 2,"[6] who was twelve years old.

19        As the children played, A. noted a dark, older model Volkswagen van drive past the

20    playground.  Shortly afterward, [Petitioner] Joseph Schoenhoeft approached the children on the

21    playground. [Petitioner] was wearing a black vest, a long sleeve green shirt, and black pants.  C.

22    though [Petitioner's] clothes were like a police uniform. [Petitioner] approached Nou, produced a

23    badge from his pocket, and quickly showed it to the children. [Petitioner] said he was either a

24

25        [4] The Court finds the Court of Appeal correctly summarized the facts in its May 23,2002, opinion.  Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.  For ease of reference, the
26    Court will not single space the text of the opinion, despite the fact that it is copied verbatim.

27        [5] "John Doe 1" will be referred to as A. in this opinion.

28        [6] "John Doe 2" will be referred to as C. in this opinion.

1    policeman or a school security officer, and he was investigating vandalism at the school.

2        [Petitioner] asked Nou for the children's addresses and telephone numbers.  Nou gave him

3    the information and he wrote it in a notebook. [Petitioner] then asked the children to help him

4    investigate the vandalism report, and look around the school for any evidence of damage or a

5    burglary. [Petitioner] instructed Nou and John to look around one area of the school, and instructed

6    A. and C. to follow him.  A. and C. followed [Petitioner] as they looked around the cafeteria, then he

7    instructed C. to look on the other side of campus and directed A. to stay with him.

8        A. followed [Petitioner] as he walked toward the parking lot, where the dark-colored

9    Volkswagen van was parked. [Petitioner] told A. to get into the van, and produced a pair of

10    handcuffs from the back of his waist or his back pocket. [Petitioner] handcuffed A.'s hands behind

11    his back, and said A. matched the description of the person who broke into the school and stole some

12    property. [Petitioner] opened the sliding door on the passenger side of the van and ordered A. inside.

13    A. complied and sat on the floor of the van, and [Petitioner] closed the door.

14        C. emerged from the schoolyard and saw A. being handcuffed and placed in the van.  C. ran

15    toward the van and [Petitioner] ordered C. to "'[g]et over here'" and "'[g]et in the van.'" C. got into

16    the van because he was afraid, and [Petitioner] told him to sit on the floor. [Petitioner] said they had

17    broken something, but the boys said they didn't break anything.

18        As C. entered the van, Nou saw what was happening and ran toward him.  Nou yelled at

19    [Petitioner] and asked where he was taking the boys. [Petitioner] replied the boys were being arrested

20    and he was taking them to jail.  Nou ran after the van and continued to yell, but [Petitioner] closed

21    the door and drove away with the boys.  Both A. and C. heard [Petitioner] tell Nou they were being

22    arrested and going to jail.

23        [Petitioner] told the boys to stay down on the floor and he drove around for several minutes.

24    He made two brief stops, during which he stepped out of the van for a few second then resumed

25    driving.  He did not say anything to the boys.  When [Petitioner] stopped the third time, he opened

26    the side door of the van, unlocked A.'s handcuffs, and reattached the handcuffs to the bottom of the

27    front seat to keep A. restrained in the back of the van. [Petitioner] grabbed a zippered bag from the

28    front seat, ordered C. to get out of the van, anc closed the door.

1   C. testified [Petitioner] had stopped at a deserted area where there were no houses or

2   buildings, and he ordered C. to follow him as he walked several feet away from the van. [Petitioner]

3   ordered C. to take off all his clothes and his shoes, and C. complied. [Petitioner] then told C. to

4   remove [Petitioner's] belt. [Petitioner] opened the zippered bag and produced a condom. [Petitioner]

5   ordered C. to perform an act of oral copulation on him, and C. obeyed his order.  When [Petitioner]

6   took off his own clothes, C. noticed [Petitioner] had a gun under his vest.

7   After C. testified the act of oral copulation, [Petitioner] put the condom on his penis and

8   ordered C. to lay down on his stomach.  C. testified [Petitioner] "was doing something to my butt,"

9   then [Petitioner] got on his hands and knees and sodomized him.  C. testified it was hard and hurt.

10  C. testified [Petitioner's] mood was serious as he did the act. [Petitioner] asked C. if he liked it and if

11  it felt good, and C. said no.

12  A. remained handcuffed in the van as [Petitioner] molested C. A. believed [Petitioner] and C.

13  were outside for about 15 minutes.  A. looked out the van's side window and saw [Petitioner's] head,

14  but he couldn't see C.

15  After [Petitioner] sodomized C., he ordered the boy to get dressed and they walked back to

16  the van.  As they walked to the van, [Petitioner] ordered C. to lie about his description if he talked to

17  the police, and to say he was a fat man with black hair and a beard.  [Petitioner] opened the van's

18  door and told C. to get inside.  [Petitioner] then ordered A. to lie to the police about his description,

19  and say he was fat with black hair and a beard.  C. asked what they should do if the police told them

20  to tell the truth.  [Petitioner] pulled the gun from under his vest and pointed it at C.'s foreheard, and

21  said he would shoot them if they tried to do anything or run away.  [Petitioner] closed the van's door

22  and returned to the driver's seat.

23  In the meantime, as [Petitioner] drove away from the school with the boys, Nou ran through

24  the neighborhood shouting for help.  Fidencio Amezquita lived across the street from the school, and

25  heard someone pounding on his door and shouting.  Amezquita found Nou outside, and she was

26  shouting that someone had taken away the two boys from the school.  Amezquita asked for a

27  description of the car, and Nou said it was a burgundy van.  Amezquita immediately grabbed his car

28  keys and jumped into his sedan, and drove through the neighborhood to look for the van.  Victor

1  Vallejo, Amezquita's nephew, stayed at the house with Nou, called the sheriff's department, and

2  reported the kidnapping.  Two other family members separately drove around the neighborhood to

3  look for the van.

4       Amezquita drove around the area and spotted a burgundy four-by-four truck.  He followed

5  the truck until it stopped at a feed store.  Amezquita looked inside the truck but didn't see anyone.

6  After about 20 minutes, Amezquita decided to return home because he couldn't find the van.

7       When Amezquita returned to his house, he learned that Vallejo had obtained a description of

8  the suspect from Nou, that he was a big man in a green sweater with a black vest, and driving a

9  burgundy van.  Amezquita decided to resume the search, and Vallejo joined him in the sedan.

10       Amezquita and Vallejo turned on Ashlan Avenue and noticed a burgundy and white

11  Volkswagen van in front of them.  They followed the van as it turned onto Riverbend Road, and

12  noticed the van did not have license plates.  Amezquita decided to pass the van on the left side and

13  get a look at the driver.  As he passed the van, Vallejo looked back and noticed the driver was

14  wearing black glasses, a green shirt, and a black vest.  Amezquita made a U-turn on Riverbend Road,

15  and continued to follow the burgundy and white van.  Vallejo testified the van was traveling around

16  80 miles an hour.

17       [Petitioner] apparently didn't realize he was being followed, and drove around for several

18  minutes.  A. and C. were not sure which direction they were going.  They were praying and very

19  scared. [Petitioner] continued along Riverbend Road then pulled into the open gate of the driveway

20  entrance of Robert Musso's residence.  Musso's property was between Belmont and McKinley, and

21  south of Shields Avenue.  Musso was working outside, and [Petitioner] rolled down his window and

22  asked for directions to Shields Avenue.  Musso approached [Petitioner's] van and told him he had

23  passed Shields, and the street was about a mile and a half behind him.

24       Amezquita and Vallejo continued to follow the van and saw [Petitioner] pull into Musso's

25  driveway.  Amezquita backed his sedan into the entrance of the driveway, and tried to block

26  [Petitioner's] exit to the road.  Vallejo shouted to Musso to call the sheriff's department because the

27  man in the van had kidnapped two kids from the school. [Petitioner] opened the driver's door and

28  looked behind him, and Amezquita realized he was wearing black and green. [Petitioner] quickly

1    backed the van out of the driveway, and Amezquita had to pull his sedan onto the shoulder to avoid

2    being hit by the van.

3       Vallejo testified [Petitioner's] van charged toward their sedan, and [Petitioner] seemed angry

4    and in a hurry. [Petitioner] backed up his van so that his driver's side was alongside the driver's side

5    of Amezquita's sedan, which was still facing the street. Amezquita testified [Petitioner] extended

6    his hand outside the driver's side window, and he was holding a black handgun. [Petitioner] fired

7    four shots directly into the sedan at Amezquita and Vallejo. Amezquita testified [Petitioner] seemed

8    to be driving very slow as he fired at them. The sedan's front windshield and side windows shattered

9    and there were bullet holes in the vehicle. A piece of a bullet fragment hit Amezquita's nose and

10    there was blood everywhere.

11       Amezquita thought [Petitioner] fired the handgun with his right hand. Vallejo and Musso

12    though [Petitioner] used his left hand. Musso testified he was rather surprised that [Petitioner]

13    missed the occupants in the sedan, given the close range and [Petitioner's] previous training as a

14    deputy sheriff.

15       After [Petitioner] fired the shots, he drove away from Musso's driveway. Amezquita tried to

16    continue the chase, but he was unable to follow [Petitioner]. However, Musso had been carrying his

17    own firearm, and fired a warning shot in the air to get the attention of his family and other residents

18    in the area that something was wrong. Musso later retrieved several nine-millimeter casings from

19    the area where [Petitioner] fired at the sedan.

20       A. and C. testified that [Petitioner] became mad when he realized someone had followed him.

21    The boys testified [Petitioner] produced a gun from under his vest, extended his hand out the driver's

22    window, and quickly fired four to five shots straight out of the window at the other car. The boys

23    testified [Petitioner] quickly drove away at a high rate of speed, and they were sliding around the

24    back of the van.

25       After several minutes, [Petitioner] stopped on the side of the road near a barn and fenced

26    pasture. He opened the van's side door, released A.'s handcuffs, and told the boys to get out. As

27    they left the van, [Petitioner] told A. to leave his blue Nike jacket in the van, and ordered the boys to

28    go into the barn. The boys climbed the fence and went into the barn, and [Petitioner] quickly drove

1   away.  People who were on the property immediately rescued A. and C., and the police arrived

2   within a few minutes.  The police told the boys not to worry because they would arrest [Petitioner],

3   and the boys noticed the police helicopter fly over the pasture.

4       Based on this evidence, the court found [Petitioner] guilty of count I, kidnapping of C. with

5   intent to commit sodomy, that [Petitioner] used a deadly weapon, and that movement of the victim

6   substantially increased the risk of harm.  As to count II, the court found [Petitioner] not guilty of

7   kidnapping of A. with intent to commit sodomy, but found him guilty of the lesser included offense

8   of kidnapping (§ 207), that the victim was under the age of 14 years, and [Petitioner] used a deadly

9   weapon.

10      As to counts III and IV, forcible sodomy and forcible oral copulation of C., the court found

11  [Petitioner] guilty, that [Petitioner] kidnapped the victim and the movement substantially increased

12  the risk of harm, but found [Petitioner] did not personally use a firearm in the commission of the

13  offenses.  As to count V, the court found [Petitioner] guilty of assault with a deadly weapon on C.

14  and that he used a firearm.  As to counts VI and VII, the court found [Petitioner] guilty of attempted

15  second degree murders of Amezquita and Vallejo, and that he used and intentionally and personally

16  discharged a firearm.

17                    **APPELLANT'S SANITY PHASE EVIDENCE**

18      The sanity phase trial was held immediately after the court's findings in the guilt phase.

19  [Petitioner] had the burden of proof and presented evidence as to the investigation, and his good

20  character and reputation.  However, [Petitioner's] primary evidence was the expert testimony as to

21  his mental state at the time of the instant offenses.

22  **[Petitioner] arrives in Madera**

23      [Petitioner] was married and had two children, ages five and ten years. [Petitioner] and his

24  family lived in Reno at the time of his instant offenses.  They drove to Madera, in the family's

25  burgundy and white Volkswagen van, to spend Thanksgiving weekend with his wife's family.  They

26  arrived on Wednesday night, and [Petitioner] said he was very tired and immediately went to bed.

27  His in-laws did not notice anything unusual about his behavior on Thanksgiving or Friday.  On

28  Friday night, he told his mother-in-law that he was going to visit a college friend on Saturday

8

1    morning, and he went to bed around 8:00 p.m. or 9:00 p.m.

2          However, Debra Amoruso, [Petitioner's] sister-in-law, testified [Petitioner] was not acting

3    the same that weekend.  Amoruso testified [Petitioner] was usually very outgoing, but he was

4    sometimes very down and withdrawn.  On Thanksgiving afternoon, [Petitioner] was in the garage

5    with Amoruso's husband.  He was very quiet, seemed upset, and was not talking.  Amoruso had

6    never seen him act that way around the family.  Later that day, Amoruso asked her husband if

7    [Petitioner] was okay, and her husband thought he was fine.  Amoruso testified [Petitioner] didn't sit

8    at the adult table with the family but ate at the children's table. [Petitioner's] wife initially sat with

9    the adults but she later joined [Petitioner] at the children's table.  Amoruso testified [Petitioner] was

10   withdrawn and kept to himself that day.

11         On Friday night, Amoruso again noticed there was something wrong with [Petitioner]

12   because he wasn't acting right and he was more withdrawn than usual.  He was reading a book and

13   Amoruso took it from him and joked that she was going to lose his place. [Petitioner] said he didn't

14   care and he didn't feel good, and he had a bad headache.  He went to bed very early that night.

15   Amoruso testified [Petitioner] "just was not the same [person] that we knew."  Amoruso had seen

16   him withdrawn before, it "was obvious: that [Petitioner] was acting different and depressed.  After

17   [Petitioner] went to bed, Amoruso asked [Petitioner's] wife if he was okay.  She replied [Petitioner]

18   was sick, had a bad headache, and just wanted to go to bed.

19         On Saturday morning, [Petitioner's] family got up between 7:00 a.m. and 7:30 a.m., and they

20   noticed [Petitioner] had already left in the Volkswagen van. [Petitioner's] wife briefly saw him

21   before they left. [Petitioner] seemed normal, and told his wife that he was going to meet a particular

22   college friend.  He had about a four-day growth of beard. [Petitioner] also told Amoruo's husband

23   that he was going to visit a friend and go hiking that day.

24         [Petitioner's] college friend, who usually met [Petitioner] when he was home for the

25   holidays, had left Fresno on Wednesday or Thursday.  When this friend returned to Fresno on

26   Sunday night, he found a message on his answering machine from [Petitioner]. who said that he was

27   in town for the weekend and hoped to see him. [Petitioner's] friend didn't know what day

28   [Petitioner] left the message but testified the tone of [Petitioner's] voice was absolutely normal.

**The pursuit and crash**

The sanity phase trial also included testimony about the pursuit of appellant on Saturday afternoon after he kidnapped A. and C., molested C., and left the boys in the barn.

When Nou pounded on Amezquita's door for help, Victor Vallejo called 911 and reported the kidnapping. Numerous units from the Fresno County Sheriff's Department and the California Highway Patrol immediately responded to the dispatch and searched for appellant's van. The helicopters from the sheriff's department and the CHP assisted the ground units.

The pursuing officers found A. and C. in the barn, which was located on Watts Valley Road. At 12:32 p.m., Deputy Fred Johnson was in the sheriff's department helicopter and passed over the location where the boys were found. He spotted appellant's van as it traveled north on Watts Valley Road. He followed the van for 20 minutes as it continued over the mountainous and winding roads.

Deputy Johnson testified appellant drove in a normal manner and did not make any evasive maneuvers. He turned left at Trimmer Springs Roads, then stopped as if trying to decide which way to go. He continued on Trimmer to an area where there was a junk pile on the side of the road. Appellant stopped there for about 30 seconds, then continued on Trimmer toward Balch. He stopped at the cattle crossing for about 30 seconds, then again continued on Trimmer. He remained in the van the entire time.

Deputy Johnson testified appellant pulled into a turnout just above Trimmer Marina. He stepped out of the van and held his hands close to his body, as if he was carrying something, and walked underneath a tree. Deputy Johnson lost sight of appellant until he walked back to the vehicle, with his hands at his side. He entered the van and continued on Trimmer Springs Road.

Appellant continued south on Trimmer Springs Road at approximately 40 miles an hour. Deputy Johnson testified appellant's van slowed down, stopped, and backed up, then drove forward and back again, as if he was attempted to execute a three-point U-turn. Johnson also

thought appellant might be trying to hide from the helicopter, ditch the van, and escape on foot. Appellant stopped before he completely turned around, then drove straight off the side of the road, down into a ravine, and directly into a thicket of trees. The van was traveling 15 to 20 miles per hour as he drove off the road and into the ravine. Deputy Johnson didn't believe appellant "revved" the engine as it went over the side. Deputy Johnson again thought appellant was trying to hide under the trees and evade the officers. However, the officers in the CHP helicopter observed appellant's body laying face down next to the van.

Deputy John Golden was part of the ground pursuit, and kept in contact with Deputy Johnson in the helicopter. He was advised the suspect's vehicle had driven off the road, and immediately responded to the area. Deputy Golden and his canine partner walked off the road and down the very steep incline into the ravine. He found the van had traveled about 50 feet down the ravine and landed against granite rocks and trees on the side of the hill. Appellant's body was next to the van. He was lying face down, and his head was wedged between some rocks. Deputy Golden shouted that he knew appellant had a gun, and ordered him not to move or the dog would attack him. Appellant replied that he already threw away the gun and he was paralyzed.

Deputy Golden realized appellant was seriously injured and waited for the paramedics to respond to the scene. The ravine was very steep and the emergency team had great difficulty removing appellant from the side of the hill. The paramedics strapped appellant into a gurney and brought him up the hill. Deputy Golden looked at appellant's face, and immediately recognized him as a former deputy sheriff.

Appellant suffered a severe concussion leading to shock and coma, a skull fracture, and a broken neck. As a result of the cervical fractures, appellant was paralyzed from the shoulders down and was a quadriplegic. He suffered neurological deficits and phantom pains relating to quadriplegia. He had some muscular control in his arms, but he was unable to use his forearms and hands.

Appellant was hospitalized in the skilled nursing unit at Universal Medical Center (UMC), and his trial was conducted at UMC because of his physical condition. At some point prior to trial, appellant attempted suicide in the hospital and tried to hang himself by his bedside, and said he wanted to die. By the time of trial, however, appellant was being treated by both physicians and

1  psychiatrists, and receiving antidepressants, psychotropic medication, and pain medication. The trial

2  court repeatedly reviewed appellant's physical and psychological condition throughout the trial. The

3  court determined, and defense counsel agreed, that appellant was fully oriented and capable of

4  understanding and participating in his trial.

5  **The physical evidence and the search of the van**

6  The deputies searched the area where appellant got out of his car, and found the handcuffs

7  and other paraphernalia under the tree. Appellant's nine-millimeter semiautomatic handgun was

8  found in the grass on the shoulder of Trimmer Springs Road. The gun was loaded and the magazine

9  contained two live rounds.

10  The Volkswagen van contained several sleeping bags, blankets, and camping gear which the

11  family always kept in the vehicle when they traveled. The search of the van also revealed an

12  adult-sized turquoise sweater on the floorboard behind the front passenger seat. A multi-colored day

13  pack was on the floorboard of the front passenger seat, and it contained five unused condoms, one

14  empty condom package, a knife, a tube of moisturizing lotion, a blue ski mask, and a piece of

15  particle board with brown rope wrapped around it.

16  On the floorboard of the front seat, the officers found a black ranger vest with the following

17  items in the pockets: a note pad with the victims' names, addresses, telephone numbers, dates of

18  birth, and the time; a badge holder with a badge; and a handcuff key. The front floorboard also

19  contained a piece of butcher paper, several latex gloves, and a used condom. The condom had been

20  placed inside one of the gloves, and the paper, condom and glove all contained possible

21  biological fluids.

22  A zippered green pack was in the van, and it contained an empty Smith and Wesson

23  nine-millimeter gun holster. The van also contained one loaded Smith and Wesson gun magazine

24  with eight live hollow-point rounds, a black leather uniform webbed belt, and an 18-millimeter

25  long-range gun sight. A black leather fanny pack contained appellant's identification, credit

26  cards, and cash. Finally, the two license plates for the van had been removed from the vehicle

27  and were inside the cab (799HSV).

28  Within days of appellant's arrest, law enforcement officers executed a search warrant for

1  his residence in Reno. They seized his computer and disks from his home and vehicle, but did

2  not find any pornography or other evidence indicating an interest in pedophilia. There was no

3  evidence of any files being recently deleted from the computer.

4  **Appellant's service as a deputy sheriff**

5      As discussed above, appellant attended the police academy and worked as a Fresno

6  County deputy sheriff for several years. The defense presented the testimony of several deputies

7  who worked with appellant in the sheriff's department from 1983 to 1986.

8      Deputy Golden, who discovered appellant in the ravine, testified he immediately

9  recognized appellant because they attended the police academy together in 1983, and later served

10  together as deputies. Deputy Golden believed appellant was quiet and a little bit odd, but he

11  wasn't aware of appellant having any problems when he was a deputy.

12      However, Deputy Golden recalled that appellant did not interact well socially with the

13  other students in their academy class. There were several occasions where Golden and the others

14  would be having a conversation and doing something, "and [appellant] would say, `Are you

15  making fun of me?' When the conversation was not directed to him. We were not even

16  acknowledging his presence in the classroom with 30 other people."  Based on that experience,

17  Golden testified that appellant "didn't play well with others. He was just a little off. Strange at least."

18      Deputy Richard Verdugo worked with appellant in the sheriff's department from 1984 to

19  1986. They occasionally worked as partners in the patrol unit in the Caruthers and Riverdale areas,

20  and they had a good relationship. During that time, Deputy Verdugo learned that appellant became

21  very quiet when he was in a bad mood. Appellant mentioned he was under a lot of stress about some

22  problems. However, he was always professional on the job and Verdugo never saw him engage in

23  any misconduct. He never saw appellant take any type of medication.

24      When appellant quit the department in 1986, he told Deputy Verdugo that he had some type of

25  stress-related medical problem and he was seeing a doctor. Appellant said he had a digestive

26  problem, and he had to drink a lot of Gatorade to replenish fluids. Appellant moved to San

27  Francisco, and Verdugo visited him. Appellant said he was very happy, and thinking about moving

28  to Sacramento.

1    Deputy David Tafoya also worked with appellant when he was a deputy. They patrolled the

2    same general area, and often responded to dispatches together. He had a good impression of

3    appellant's competency as an officer. Everyone liked appellant, and he was respected as an officer.

4    They occasionally went on fishing trips, and appellant said his father had been in the German army

5    and the CIA used to pick up his father for questioning. Appellant said he tried to get into the service

6    but they wouldn't let him in because of his father's war record.

7    Deputy Tafoya testified appellant decided to leave the department because he was going

8    through stressful times, and suffering intestinal problems because of his stress. Tafoya was aware of

9    a situation where a business owner complained about appellant because he acted intimidating and

10   wasn't friendly, and the department requested him to be more friendly to citizens. Deputy Tafoya

11   testified appellant decided to quit the force after this petty complaint about not smiling. Appellant

12   was "stressed out about that. And I think there were some other things, I can't recall in specific what

13   they were, but he was stressed, he said. And he made the decision to go do something else." Tafoya

14   tried to talk him out of quitting because of his investment of time and money, but appellant said he

15   had to do something else. Tafoya believed appellant suffered from work-related stress from other

16   incidents, and the petty complaint was "like the last straw" for appellant.

17   Deputy Tafoya testified appellant never displayed any unusual behavior, and never saw any

18   stress in appellant's relationship with his wife. Tafoya kept in contact with appellant after he moved

19   to San Francisco and Sacramento, and believed he worked as a bicycle messenger. Appellant said he

20   loved the messenger job, and he made the right decision to leave the department and it was the best

21   thing he ever did.

22   Deputy Tafoya testified that appellant's stress-related problems seem to be gone after he quit

23   the department and moved away from Fresno. It was hard for him to believe appellant committed the

24   instant offenses.

25   **Appellant's life after the sheriff's department**

26   Appellant also presented the testimony of several friends and family members regarding

27   his life, his character, and his good reputation, as background evidence to the testimony of the

28   expert witnesses.

1    Mark Alexander and appellant were fraternity brothers at Fresno State, and they remained

2    friends when appellant became a deputy. When they were in the fraternity, appellant tended to

3    become reclusive when he had something on his mind. Alexander testified appellant wouldn't talk to

4    anyone when he was in one of these moods. He would be noncommunicative, and he would take off

5    on his mountain bike to get fresh air. Appellant would just go into his room and stay there, and he

6    wouldn't talk with anyone. Alexander couldn't connect appellant's moods to any particular events.

7    Appellant told Alexander that he left the sheriff's department because of internal politics.

8    After appellant left the sheriff's department, he briefly lived in Sacramento and San

9    Francisco. He later went to the Palmer Chiropractic School in Sunnyvale. Appellant then moved the

10    family to Albuquerque, New Mexico, and opened a chiropractic practice. However, he had a hard

11    time operating his business and getting patients, and he struggled to earn a living.

12    Appellant's former patients testified he was very professional and cared about his patients,

13    and they never observed him engage in any misconduct. He felt great stress and pressure to be

14    successful but he didn't do well financially. A friend testified appellant "always had the feeling that

15    he wasn't good at anything" and "he would just, you know wanted to be sure everything was right."

16    She believed appellant's lack of success affected his behavior and caused mood swings.

17    Appellant moved the family to Reno because his practice wasn't successful and they wanted

18    to be closer to his wife's family in Madera. Appellant worked as a security guard at the Silver Legacy

19    Casino in Reno while he was organizing his chiropractic practice. His security equipment included a

20    badge in a badge holder, a webbed belt, and handcuffs.

21    Darrell Anderson worked with appellant as a security guard at the casino, and noticed

22    appellant went through times when he was just depressed, withdrawn, and very emotional.

23    Appellant acted that way about every six months. Anderson described appellant as one of the more

24    mellow security guards, and he never engaged in physical confrontations. However, appellant didn't

25    like being a security guard and wanted to work again as a chiropractor. Appellant told Anderson he

26    had become a Buddhist because he liked meditation and philosophy. Appellant also told Anderson

27    he quit working as a deputy because he didn't like the criminal element, and liked being a

28    chiropractor because he wanted to help people.

15

1    Appellant conducted his chiropractic practice in his house in Reno. His wife also used their

2    house to operate a daycare facility. Appellant enjoyed martial arts, and regularly worked out at a

3    local martial arts studio.

4    Sydney Fenton testified his wife was treated by appellant in Reno. Fenton was so impressed

5    with appellant's care that he tried to help him organize his business operations and billing system.

6    Fenton also tried to help build appellant's practice by introducing him to other members of the

7    community. Fenton described appellant as a "pretty poor" businessman. Appellant's practice was

8    growing, but he and his wife were overwhelmed by the business and billing operations. Fenton

9    recommended an accountant, but he didn't know if appellant followed through with the advice.

10   Appellant often performed charitable work at a food bank in Reno. He also did volunteer

11   work at his children's religious school, and assisted the students at track meetings and other

12   sporting events. He was a scout leader for boys in a church connected organization. Sister

13   Margaret Oates, a teacher at his children's school, testified appellant had goodness in him, but

14   there was always a slight distance in his relationship with others.

15   Regardless of appellant's business problems, his family and friends testified he was a decent,

16   helpful and loving person, who was an upstanding member of the community and always willing to

17   help others. He was "rock solid. Just strong character." He was courteous and friendly, and never

18   pushy or aggressive. He was a caring husband and father. They were shocked by the charges in this

19   case, and could not believe he committed the offenses because the acts were complete aberrations

20   from his personality. They had never seen him engage in any misconduct with children, and they

21   trusted him with their own children on camping trips and other social activities. In addition, his

22   wife's clients in the childcare business never encountered any misconduct from either appellant or

23   his wife.

24   However, these witnesses also acknowledged appellant tended to be moody and internalized

25   things, and it would "take a lot of talking and prodding" to get him to express anything he was

26   feeling. He was "pretty stoic" about anything that bothered him. Appellant tended to "hold things ...

27   in quite a bit." A former patient testified appellant  was "always very quiet" and "real concerned

28   about how he made other people feel. He always wanted to make sure everything was right."

1   Appellant mentioned to some of his friends that he suffered gastrointestinal problems, and discussed

2   relaxation and proper spinal alignment as possible treatments for his condition.

3         Sandy Anderson, a friend and patient in Nevada, testified she talked with appellant about her

4   own emotional problems and seasonal mood swings. Appellant said that he also suffered from

5   depression and mood swings about twice a year, and sometimes he just had to be alone because

6   noise would bother him. Anderson testified appellant usually enjoyed visiting with his patients, but

7   he sometimes demonstrated mood swings that were extreme enough for her to notice because he was

8   very quiet. However, Anderson was never afraid of appellant during these mood swings.

9         Ms. Anderson testified she discussed her niece's emotional problems with appellant, and

10  that her niece claimed her problems were the result of being sexually molested as a very young

11  child. Appellant replied that he knew children who had been abused may not show outward signs

12  or remember the incidents, and "he had known of this personally, but it had gotten better. But I

13  didn't know - really know what he was referring to."

14        Appellant was not close to his own family, and felt closer and more comfortable with his

15  wife's family. When appellant was in college, he told a friend that his father was a Luftwaffe

16  commander for the German army in World War II, and he gave his children a very strict upbringing.

17  Appellant told his in-laws and friends that his father was very strict and physically disciplined him

18  when he was a child, and used him as the "whipping boy" for the family. Appellant told his friends

19  that his father ordered him to leave home when he was 17 years old. However, appellant never said

20  that he was sexually abused as a child.

21        Marva Harper, a friend in Albuquerque, testified to an incident when appellant suffered a

22  severe headache when the families were visiting each other. She thought he was going to die because

23  the pain was so bad. He went home and was so sick he couldn't make it into bed. However, appellant

24  refused to go to the doctor because he believed in homeopathic medicine.

25        Appellant's friends were also aware that appellant and his wife were experiencing marital

26  problems in the year prior to the offenses. However, there was no evidence of violence between

27  them. Ms. Harper testified about an incident when appellant lived in Reno. Appellant's wife called

28  her, and said appellant was very upset and wanted a - divorce. Appellant's wife was sleeping in one

of their vehicles because appellant needed space. Ms. Harper believed appellant was under great stress because he was still trying to see chiropractic patients, but he was only charging $20 for each patient regardless of their treatment. His wife was operating the daycare business in their house, and Ms. Harper believed their financial and personal situations were "just more than what [appellant] could handle." Appellant and his wife eventually worked things out and they did not separate.

Joseph and Mary Amoruso, the parents of appellant's wife, lived in Madera. Appellant and his family had traveled from Reno to Madera to spend Thanksgiving with the Amorusos just prior to the instant offenses. The Amorusos described appellant as a wonderful and loving husband and father, and they regularly visited the family when they lived in Albuquerque and Reno. They never saw him engaged in any misconduct with his children, nieces and nephews.

Darrell Anderson had remained friends with appellant after working with him at the casino. Anderson continued to notice that appellant went through mood swings in which he would become quiet and reclusive. He would still smile and be friendly, but he wasn't as outgoing as he usually was and his eyes "would be a little duller." Appellant would look sad and emotional rather than his normal self.

Anderson testified that about one month prior to the instant offenses, appellant looked very depressed and said he wanted to sell everything, buy a sailboat, and live on the boat with his family. Appellant said he would learn to work on refrigeration units because he could do such work while sailing around. Anderson asked if he had any training, and appellant said he learned to sail as a boy and he could learn how to work on refrigeration units. Anderson thought such a big career change was strange because appellant liked being a chiropractor, and asked appellant why he was thinking about doing this. Appellant didn't want to talk about it, but said that he wasn't making it as a chiropractor and all his money was going toward insurance. Appellant wanted to "get out from underneath." Anderson testified that appellant indicated money wasn't the only problem, "but that was part of it." Appellant wanted to sail to the South Pacific and Fiji Islands.

Appellant used Anderson's computer and searched on the Internet for sailboats. Appellant also bought some supplies which he intended to put on the sailboat. Anderson asked appellant's wife about his plans to live on the sailboat, and she knew about it and planned to home school the

1   children.

2       Sandy Harper spoke with appellant the day before the family left Reno to spend Thanksgiving

3   in Madera. Appellant said he was apprehensive about the trip because he didn't want to drive the van

4   across the pass in the snow. Appellant was not looking forward to spending the holiday with his

5   in-laws and their large family because he didn't like being with big crowds. Appellant said all the

6   people and noise made him nervous, and he felt he needed to be someplace where it was more quiet.

7   Appellant repeatedly told Harper that he didn't want to go, and "that just seemed unusual he would

8   keep repeating himself." Harper spoke to appellant for about 10 minutes, and appellant repeated that

9   he didn't want to go about five or six times. Harper thought appellant's statements were strange

10  because he frequently drove in the snow, and he usually enjoyed visiting the family.

11      Joyce Schoenhoeft, appellant's wife, testified that his friends and associates

12  considered him eccentric. There were times when he was distraught and unhappy, and he suffered

13  mood swings without warning. She attributed the problems to his lack of self-confidence and she

14  would always remind him that he had many friends and he was a good person.

15      When they lived in Albuquerque, appellant had a bad dream about his childhood

16  molestation. She didn't know about this incident prior to the dream. When they moved to Reno,

17  they had marital problems because he demanded to have anal sex and she refused. Appellant

18  didn't repeat his demands, but she felt they needed to discuss the matter and they went to a

19  marriage counselor in 1997 and 1998. Their marital problems also led to her sleeping in her car

20  one night. She went home the next day and they never separated. She believed things were

21  better after they went to counseling, even though they never discussed his sexual abuse with the

22  counselor.

23      Mrs. Schoenhoeft testified that about 10 days before the instant offenses, appellant began

24  taking Metabolite,[7] a dietary supplement used to lose weight. Appellant weighed about 310

25  pounds, and he was upset about gaining so much weight.. He took the supplement based on the

26  recommendation of a patient. Appellant regularly took the supplement every day prior to the

27

28      [7]  The reporter's transcripts reflect the spelling of this term as "Metabolife" and "Metabolite."  For consistently,
    "Metabolite" will be used in this opinion.

1   instant offenses.

2       Mrs. Schoenhoeft testified that on Monday of Thanksgiving week, appellant seemed

3   normal and nothing unusual happened. On Tuesday, appellant's demeanor was aggressive and he

4   was upset because he didn't have a good session during his martial arts lesson. She didn't

5   remember appellant saying that he didn't want to go to Madera for Thanksgiving, but he

6   repeatedly asked when they would return home. On Wednesday afternoon, appellant was upset

7   because a patient didn't show up, which disrupted his schedule and delayed their departure. That

8   night, appellant drove the van from Reno to Madera but he didn't talk for the entire trip.

9       Mrs. Schoenhoeft testified appellant was very "antsy" on Thanksgiving Day, which she

10  attributed to his use of Metabolite. He sat with the children rather than with the adults for dinner, but

11  there was nothing unusual about that. On Friday, she went shopping while appellant stayed around

12  the house. She didn't see anything unusual in his behavior. She briefly saw him when he left the

13  house on Saturday morning. He seemed normal, and said he was going to try and meet a particular

14  college friend, which is something he usually tried to do when they were home for the holidays.

15      Mrs. Schoenhoeft testified appellant never possessed any materials related to pedophilia and

16  never exhibited violent conduct prior to the instant offenses. She had never been scared or frightened

17  of him, even when he suffered from his mood swings and depression. She had no idea why the black

18  vest, handcuffs, and badge were in the van because appellant had stored these items in the basement

19  closet after he quit the casino job. She never saw appellant pack the black vest, put it in the van, or

20  bring it into her parents' house on Thanksgiving weekend. However, appellant packed his blue parka

21  for the trip, and the parka was hanging next to the vest in the same closet. Appellant regularly carried

22  his gun when the family traveled and kept it in a zippered bag.

23  **Appellant's trial testimony**

24      Appellant testified at the sanity phase about his background, and his inability to remember

25  anything about the instant offenses. Appellant grew up in Sanger and attended Fairmont School, the

26  place where he kidnapped the children, and described his years there as "wonderful." He grew up

27  about one mile from the school, and was very familiar with the area because he used to ride his

28  bicycle there.

Appellant lived with his parents and siblings when he was growing up. His father was a very strict disciplinarian, and frequently used physical force and beatings to punish him. After the day of the offenses appellant's family became estranged from him.

Appellant's father was from Germany, and he was an officer in the German Army and a member of the Nazi party during World War II. When the family lived in Sanger, appellant's father became involved with the anti-Vietnam War movement and the FBI took him in for questioning on several occasions. Appellant also thought his father was under surveillance in those years.

Appellant's family grew alfalfa, and he and his brother would deliver the hay to customers. When he was eight years old, one of their alfalfa customers approached the brothers while they were working, and offered to pay appellant's brother if he would take off his clothes. His brother refused but appellant agreed, and the man sodomized him. Appellant didn't like it and told the man that it hurt, but the man just laughed. Appellant tried to tell his father but he didn't want to hear about it. Appellant testified the man who molested him was fat and heavyset, with dark hair and a beard. A few years after the molestation, appellant caught his father engaged in a homosexual act with a friend. When his father realized he was there, he yelled at appellant to get out and run away. Appellant told his brother about it, but his brother told him to forget about it and never mention it again.

Appellant testified he had tough times as a teenager, and he once tried to drive his car into a telephone pole. Appellant didn't succeed, but he "would have, if I would have had a better aim. But the car didn't go as I expected it would." He was bruised and injured and wrecked the car, and he stayed with some friends for awhile.

Appellant attended Sanger High School and transferred to Clovis High School, then went to Fresno State for four years. He studied criminology but left college without obtaining his degree because he ran out of money. He joined the Marine Corps and started Officer Candidate School, but he didn't like it and applied for the reserve program in the sheriff's department.

Appellant married his wife, Joyce, in 1983, just before he entered the police academy. As of trial, they had a five-year-old daughter and a ten-year-old son.

Appellant became a first-aid reserve deputy for the Fresno County Sheriff's Department, and

21

worked at University Medical Center as a guard. He also worked in the jail and on patrol as a reserve officer. After he worked as a reserve officer, the sheriff's department put him through the academy in 1983 or 1984. He received training in handling and shooting firearms. Appellant classified his ability as average. He graduated from the academy and entered the field training program, and was assigned to the Selma substation. He served as a deputy for four years.

Appellant testified he left the sheriff's department because he was disturbed by his colleagues' lack of consideration for the law. They were "pretty free and easy with arresting people, and I thought that was wrong." He believed people were arrested more for emotional reasons than for committing crimes. However, appellant described Deputies Verdugo and Tafoya as exceptional officers. Appellant also decided to quit because he realized he was incapable of shooting or harming anyone.

Appellant testified he suffered from severe intestinal and bowel problems since he was a child. When he was a deputy, his doctor advised that he needed to leave law enforcement because he couldn't deal with these issues, so he decided to quit the department.

After quitting the department, appellant and his family moved to San Francisco and he worked odd jobs, such as being a process server and a messenger. They moved to Sacramento, where he worked in a warehouse and at a sign company. Appellant went to college in Sacramento and took the prerequisite courses because he wanted to attend chiropractic school. Appellant went to Palmer Chiropractic School in Sunnyvale, and graduated in 1993.

Appellant moved his family to Albuquerque and opened his chiropractic practice, but they stayed there only two years. He wasn't happy in Albuquerque because the town was very segregated and racist. Appellant and his family did not enjoy the recreational and camping opportunities in the area, and they wanted to be closer to their families.

Appellant next moved his family to Reno, and worked as an unarmed security officer at the casino while he was getting his chiropractic practice started. His wife initially operated a daycare center in their home until the licensing requirements became too expensive. She later worked at UPS and a restaurant.

When appellant worked at the casino, he purchased a black vest to wear for his plainclothes

22

1   duty. He carried a badge in a holder, handcuffs, and the handcuff key in the vest pockets. Once he

2   established his chiropractic practice, he stopped working at the casino.

3         Appellant described himself as physically fit prior to the instant offenses. He was six feet five

4   inches tall and weighed about 310 pounds. He was very active physically and enjoyed martial art.

5   However, he still suffered from digestive problems diagnosed as colitis, but he was never adequately

6   treated. He suffered several severe injuries to his head, and suffered a stroke in 1994. As a result of

7   the stroke, he lost some vision in his left eye and suffered migraine headaches.

8         Appellant testified that prior to Thanksgiving 1998, he became very depressed. His business

9   was not going well, and he decided to sell everything, buy a boat, and sail around the world with his

10  family. He would take odd jobs and learn to repair refrigeration equipment, which was used on larger

11  boats. He learned how to sail on Lake Tahoe, and he checked the Internet to buy a boat. However, it

12  was taking too long to sell his practice, and the delay was making him more depressed.

13        Appellant testified he never had homosexual or pedophilia urges. When they still lived in

14  Albuquerque, he had a dream about when he was sexually molested as a child, and told his wife

15  what had happened to him. After he had the dream, he became obsessed with having anal sex with

16  his wife but she refused. This led to additional problems in their relationship, and they discussed

17  these issues with the marriage counselor in Reno. However, the counselor was only concerned with

18  their marital problems and didn't let appellant discuss his feelings about the childhood molestation.

19  This situation made appellant's depression even worse.

20        As a result of his depression, appellant began to eat too much and weighed over 300 pounds.

21  He had done this during previous depressive episodes, but he was always able to lose weight. Based

22  on the recommendations of a patient, he purchased Metabolite, an herbal supplement used for

23  weight loss, about 10 days before Thanksgiving. He took one pill for three days, then three pills a

24  day and then increased the dose to four pills per day.

25        Appellant's memories of the days leading to Thanksgiving 1998 were fragmented and vague.

26  He knew that his wife wanted to visit her family, and they discussed the trip on Sunday of that week.

27  However, he didn't want to go because of the bad weather and his deep depression. He didn't like the

28  noise when the large family gathered together. He told his wife about his feelings, but she said it was

23

1 | important to be with her family for the holiday.

2 |      Appellant remembered taking Metabolite on Monday, and presumed he must have taken the
3 | pills on Tuesday. Appellant also remembered going to his martial arts class in Reno on Tuesday
4 | night. He had vague memories that he felt very angry and aggressive that day.

5 |      Appellant did not remember packing the van for their trip. He reviewed the inventory list of
6 | items found in his van, and was unable to remember why certain things were there. He knew they
7 | usually packed camping gear, blankets, and food in case they were stuck in the snow. However, he
8 | admitted it was very unusual to have taken his black vest with him, and he didn't remember packing
9 | it for the trip. After he quit the casino job, he stored the vest in the basement closet and never used it.
10 | The vest pockets still contained his badge in the badge holder, handcuffs, and handcuff key.
11 | Appellant thought he might have taken the vest when he removed his snow parka from the same
12 | closet. The black-webbed belt was also from his security uniform, but he didn't know why it was in
13 | the van.

14 |      Appellant believed the latex gloves and condoms were usually kept with other medical
15 | supplies in the van's first aid kit. However, he didn't know how those items ended up in his zippered
16 | bag. He also kept the old rifle sight in the van, and his son used it like binoculars. The cream and
17 | lotion tubes were used when he gave massages. The ski cap and rope were from his sailing lessons at
18 | Lake Tahoe.

19 |      Appellant testified the firearm he used during the instant offenses was a Smith and Wesson
20 | nine-millimeter handgun, which was his backup service weapon. He did not have a license to carry a
21 | firearm after he left the sheriff's department. He carried the unloaded weapon on family trips for their
22 | personal safety. He usually kept it in a zippered bag, along with the ammunition clips. However, he
23 | had no memory of loading the gun.

24 |      Appellant testified he had no memory of driving from Reno to Madera on Wednesday, or
25 | spending Thanksgiving Day with his family. He had no memory of calling his college friend and
26 | leaving a message to meet him that weekend.

27 |          "[I]t's kind of like looking through the wrong end of the
         telescope. That is the only way I can describe how I was seeing these
28 |          few instances that I can remember. Things were so far away from me, I

> was so displaced, not only physically, it felt like, but also mentally and emotionally. I was not anywhere near anybody else. [y[] And I remember my wife sitting on my lap, kind of. I don't remember what I was feeling at that time."

Appellant testified it was common for him to go to bed early and sleep a lot when he was depressed, and his family was used to that behavior.

Appellant did not remember getting up on Saturday, November 28, 1998, the day of the offenses. Appellant testified that he did not have any recollection of the actual commission of the offenses in this case, and just had "very brief and very vague memories" about the day of the incident.

> "It's like opening a door or opening a covering and looking through it and seeing something very, very far away, everything out of your perspective. Like what I had said before is looking through the wrong end of the telescope. Everything seemed so far away and distorted. But what the worst part of it is the feeling that I had, the feelings that I have when I recall it is that for me, it was like opening the door to purgatory. It was like waking up in the middle of a nightmare is what it felt like. [§] ... [§]
> "It was terrifying. Whatever was there was not -- was not me. I could see myself, but it wasn't me. And I couldn't get away from it. The emotions that came from seeing this were like physical blows. It terrified, absolutely terrified me. And I thought that if I didn't -- I felt that if I didn't get away from it, I would be consumed."

He didn't remember driving from his family's house, but he vaguely remembered seeing the school grounds. He didn't remember talking to the children or kidnapping them. He didn't remember driving the boys away from the school, sexually molesting one of the boys, or threatening them in the van with the gun. He didn't remember asking for directions, or shooting at the men who were trying to help the boys.

Appellant described his first memory as "waking" and seeing the Trimmer Springs Road sign, and wondering what he was doing there. It was very frightening because his last recollection was being in Reno. Appellant was very afraid and confused and drove around, but saw the gun on the passenger seat. He smelled gunpowder and realized something terrible had happened. He continued driving and felt as if he was hit in the head with a baseball bat.

> "Just anger. Just beyond, beyond rage. It was almost like a berserk attitude that it would be like all of -- all of my years of holding things inside. All of the -- no, it's like -- it was like drowning. It was like

drowning. Something was filling me up, covering me over. And it was
just -- it was just anger."

Appellant became scared and threw the gun and other items out the window because he didn't want
to hurt anyone. He was scared that he would "somehow be swallowed up by this feeling." The
feeling became worse and he heard a voice, "whether it was mine or someone else's, yelling, `Hurt
them. Fight. Kill. Don't back down,' kinds of things." Appellant tried to resist the voice but felt he
wasn't strong enough and it would overwhelm him.

"This was just too much for me. And I knew that I had to do
something to stop myself from hurting anybody, hurting anybody. So I
saw the cliff and I drove over it."

He didn't remember driving over the cliff, but knew it was his only option to prevent himself from
hurting someone else. He felt peaceful and knew it was the right decision. He didn't remember
Deputy Golden talking to him, or being removed from the crash site by the paramedics. His next
memory was waking up in the hospital and being in great physical pain.

Appellant did not remember telling the boys to describe him as being fat, with black hair and
a beard, and he learned about this information when he read the police reports. He realized this
description actually fit the man who molested him when he was a child. He also didn't remember
contacting the children, on the playground and asking about an incident of vandalism, and also
learned about this fact through the police reports. Appellant testified his statements to the children
were very similar to the circumstances when he investigated a burglary at Caruthers Elementary
School when he was a deputy, but he didn't molest any children during that incident.

Appellant testified he still suffered great pain from his physical injuries, but he didn't suffer
any more psychotic delusions since he had been placed on medication by the psychiatrists. Appellant
accepted that he committed the crimes because he read the police reports and preliminary hearing
transcript. Appellant didn't know how or why he committed these "horrible crimes," and hoped to
someday learn "who I was" when it happened, because "if there was any part of me out there, I
wouldn't have done it. There is no way. I could not have. I have lived with this kind of pain my
whole life. And I would not -- I would not have done it. Somehow, something took over. Somehow,

26

1  something consumed me. And one percent of me was out there. The sorrow I have is just

2  incredible."

3       At the close of appellant's testimony, the trial court asked appellant several questions about

4  his recollections. Appellant remembered hearing the helicopters and knew he threw the gun out of

5  the window. However, he had no memory of getting out of the van and dropping something under a

6  tree. Appellant confirmed the license plates found inside the van were the plates for the van, but

7  there were two other plates in the van that he didn't know about[8]. Appellant had no idea why his

8  black vest was in the van. The front license plate was no longer on the van because he had previously

9  torn off the front bumper. However, he definitely believed there had been a rear license plate on the

10  van.

11  **Testimony of appellant's experts**

12       Appellant presented the expert testimony of Dr. Miles Estner and Dr. Howard Terrell,

13  who explained appellant was manic depressive and insane at the time he committed the instant

14  offenses.

15       Dr. Estner, a board certified forensic psychiatrist, evaluated appellant while he was

16  hospitalized at UMC. Dr. Estner believed appellant was bipolar and suffered from manic depression.

17  Appellant also suffered from posttraumatic stress syndrome from childhood, and toxic delusions.

18  Appellant's prior history of mood swings and depression, his attempted suicide as a teenager, and

19  being detached, reclusive, and noncommunicative, were consistent with manic depression.

20       Dr. Estner testified appellant was legally insane when he committed the instant offenses,

21  based on the M'Naughton standards. Dr. Estner testified appellant did not know and understand the

22  nature and consequence or qualities of his acts, or he was not able to distinguish right from wrong at

23  the time he committed the crimes. While appellant understood his conduct, "he didn't understand that

24  it was wrong." Dr. Estner was "pretty certain" about his diagnosis.

25       Dr. Estner testified appellant's condition of manic depression and posttraumatic stress was

26  further complicated because he was taking Metabolite, an over-the-counter dietary supplement used

27

28       [8]  Appellant's wife believed these other plates were from the previous owner of the van.

to lose weight which contains ephedrine, a psychostimulant and mind-altering drug. Dr. Estner had

studied three other individuals who had taken Metabolite or similar compounds with ephedrine.

These individuals already had preexisting psychiatric problems, and the ingestion of the substance

resulted in the individuals doing something markedly different and quite outstanding from their

normal behavior.

Appellant's wife told Dr. Estner that he had been taking Metabolite for about 10 days or two

weeks before the incident. Dr. Estner had seen the jar of pills, and it was about one-third empty. The

instructions were to take one or two pills a day for a couple of days, then increase the dosage to 10 or

12 pills per day. Appellant's wife told Dr. Estner that she noticed an observable change in his

personality because he seemed jittery, like he was wired.

Dr. Estner explained that thousands of people take Metabolite to lose weight, and most of

them don't become sick from the pills. However, people who have preexisting psychiatric problems

suffer from the more extreme effects of ephedrine. "Someone might seem a little wire[d], might be

paranoid, or avoidant in company, might feel nervous with other people around. And sometimes they

spin out" and lose contact with reality "and start doing things that were not part of their behavior

repertroire previously." The person would become manic or grandiose, and "get high ideas about

themselves or set out on very ambitious projects." Ephedrine would also affect a person's sleep

pattern because it leaves the person exhausted. A person could suddenly go "crazy when they have

had a period of time of reduced appetite and less sleep, seem to go off. But I think you expect an

interval, where they're escalating."

Dr. Estner believed the combination of appellant's ingestion of Metabolite, and his preexisting

manic depression and posttraumatic stress syndrome, could have caused appellant to come "unglued"

under the influence of the substance. The ephedrine in the Metabolite caused a kind of psychosis in

which appellant was "not fully aware and not really fully recording the events as they [took] place."

The ephedrine made appellant seem more isolative and jittery.

Dr. Estner conceded no toxicology tests were performed to determine the existence of

ephedrine in appellant's bloodstream or liver. An immediate toxicology screen would have probably

shown ephedrine compound in his system, but the fluids appellant received during the emergency

1   medical treatment would have diluted the level of ephedrine in his body.

2       Dr. Estner conceded that it was possible for a person in a state of delirium to act in a

3   purposeful, premeditated fashion. The best way to describe appellant's condition when he committed

4   the offenses was to say "the person committing them knew they were committing them, but I don't

5   think it was [appellant]. That's the best way to put it. I think he was other than himself." The events

6   were not totally spontaneous, but appellant "was unaware of them. But he carried them out. They

7   weren't -- spontaneous in the sense that they're seemingly purposefulness, that he talked to people,

8   that he gave them reasons why they should cooperate with him, that that led to people cooperating

9   with him. But not so clear to me that it was scripted out in a rational way as this is something I'm

10  going to be able to accomplish and get away with." There were some thought processes going on that

11  led to things happening in a goal-directed way, "[b]ut I don't think they affect someone's awareness

12  of what they were doing."

13      Dr. Estner conceded appellant set out to assault the boys, but he was "out of his mind" when

14  he committed the offenses, regardless of the preparations he may have taken to accomplish the acts.

15  "So that is why I called them seemingly purposeful behaviors, because they clearly have a goal, but I

16  think the person who is doing it is out of his mind." "There [was] obviously some element of

17  planning and carrying it out, but I think it is someone who has lost his mind."

18      Appellant was not a "percolating sex offender who erupt[ed]," but a person who was

19  "psychologically unstable and does a bizarre thing. And I saw it more as someone who is

20  psychologically unstable and does a bizarre things [sic]." Pedophiles "usually go from mild acts of

21  perversion to more dramatic ones. In this case, I think there is more a pattern of psychological

22  instability becoming worse and worse and culminating in a seemingly pedophile act."

23      Dr. Estner conceded appellant engaged in planning activities, such as dressing like an officer,

24  but such conduct was symptomatic of his craziness and deterioration which led to the sudden

25  eruption in behavior. It was hard to say when appellant reached the breaking point, but appellant's

26  progression of mental illness was "possibly precipitously provoked" by the ephedrine in the

27  Metabolite.

28      Dr. Estner conceded appellant's memory loss could have been caused by the severe physical

29

1    injuries, concussion, and the depressed skull fracture he suffered when the van went into the ravine.

2    He also conceded the memory deficit did not discount the possibility he knew exactly what he was

3    doing up to the point he was injured. Dr. Estner believed appellant's inability to remember the

4    incident was the result of the delirium induced by the ephedrine. However, appellant fully

5    remembered his hospitalization after he regained consciousness at UMC.

6         Appellant acknowledged to Dr. Estner that he was experiencing marital problems, and he

7    would often "space out" during sex with his wife. Appellant also acknowledged he had a sudden

8    fixation with anal sex, and it led to a conflict with his wife. However, Dr. Estner testified appellant's

9    feelings were driven by mental illness and showed his increasing mental instability and abnormal

10   behavior. He did not believe appellant's sexual interests were part of a continuum that led to the

11   molestation of the boy in this case. Dr. Estner conceded appellant was still able to function in normal

12   society despite his mental problems.

13        As for Thanksgiving weekend, appellant told Dr. Estner that he remembered driving from

14   Reno to Madera. He remembered taking Metabolite, and remembered having some psychological

15   deterioration. He remembered "snapshots" from two days before he left Reno. While his memory

16   was "spotty" as to the events leading up to the offenses, he had a "pretty big blank for the incident

17   itself, and then some memory of before, driving himself off the road." His first memory of the

18   incident herein was seeing a road sign and being in his Volkswagen. Appellant was confused and

19   didn't know why he was there, and had a bad feeling. He saw the gun on the passenger seat, and was

20   scared that he might be in some type of legal trouble. Appellant had no memory of being at the

21   school, picking up the boys, or asking directions.

22        Dr. Estner read his notes as to appellant's memories of the incident:

23             "Turned around, went back downhill, saw helicopters, knew
             they were for me, felt as if there was a presence, fight, we can get out,
24            fight them, hurt them, felt like losing myself. Draining, an internal
             fight. Screaming no to myself, Not you too. Can't. I think he was
25            talking about weighing whether he was going to kill himself or not.
             Says he threw his gun out the window. Felt close to purgatory, slipping
26            into a hole. Realized I was losing and drove off the cliff. Didn't want to
             hurt anyone. Felt total relief. I think once he made that decision. Wish I
27            had died. Those are the memories that I was able to get from him."

28

Appellant said he threw the gun away so he would not use it against other people. He felt he was slipping into a hole and drove off the cliff because he didn't want to hurt anyone, and felt total relief.

Appellant informed Dr. Estner that he had been sexually abused as a child, and observed an incident of homosexual behavior between his father and another man. Dr. Estner believed these incidents were the foundation "for what eventually happened later in an unfinished state." Appellant had reacted to his abuse by being a "helper-type person, as if he had to win other people's approval all the time by helping them out." Appellant's commission of the instant offenses, however, was a reenactment of the trauma he suffered as a child. There was no evidence of similar behavior before these incidents, and appellant did not possess any child pornography, magazines, or pictures. "And that is supportive of my opinion that he was other than himself. Legally insane, but other than himself when he did what he did. In other words, there was no pattern of that already being present in his life, this being the one incident that came to public attention."

Dr. Estner concluded appellant did not make a conscious decision to perform the acts in this case. His opinion relied fairly heavily on appellant's ingestion of ephedrine as "just taking the lid right off of whatever ability he had to restrain." There were other factors which supported his insanity opinion: appellant's commission of the kidnapping near the site of his own childhood trauma, which showed he was acting out of psychiatrically-driven behavior; and appellant's apparent intent to return the children to the school, which showed he lacked sophisticated criminal behavior or awareness he was doing wrong. In addition, appellant told the boys to lie to the police and say the kidnapper was fat, with black hair and a black beard. However, this "false" description was similar to appellant's actual appearance because he was very big, had black hair, and was unshaven. The nature of this conduct indicated appellant "had some knowledge that there is something wrong about what he is doing, on the other hand, he tells the child to identify him as closely as possible to himself as can be. Indicating impairment, I believe, in the ability to distinguish right from wrong."

On cross-examination, Dr. Estner conceded appellant acted in a very goal-oriented manner when he kidnapped the boys from the school, evaded their sister's attempt to stop him, drove to a remote area, and molested one of the boys. Appellant also performed normally when he drove away from the remote area, and seemed to be returning to the school but for missing one particular turn. Appellant

acted normally when he stopped at the driveway to get directions, but made a conscious effort to evade the two men who tried to stop him, and intentionally fired at them. Dr. Estner conceded appellant "clearly has some perception that these people were trying to impede his progress." However, Dr. Estner believed appellant shot at the two men because they were stopping him from accomplishing his task, which was his "goal of bringing the kids back to school, someone encountering him, asking people for directions and people getting in your way, and you try to take them back, that behavior is showing troubles with distinguishing right from wrong or showing any sophisticated level of criminal behavior." Dr. Estner conceded appellant became aware of his surroundings when he found himself at the street sign and thought something was wrong. He didn't see any awareness prior to that point.

Dr. Terrell, a board-certified forensic psychiatrist, also testified that appellant was insane when he committed the instant offenses. Dr. Terrell testified his opinion was "a very difficult call."

> "[I]t is more likely than not, although I can't say for certain, but more likely than not I believe [appellant] was suffering from a psychotic mental disorder that most likely prevented him from being able to fully or adequately comprehend the wrongfulness of his actions."

Dr. Terrell believed appellant suffered from bipolar or manic-depressive disorder. Appellant had previously been psychotic due to his mental illness and had "probably the most severe manic and psychotic episode of his lifetime." Appellant's condition may have also been associated with his use of Metabolite, and the impact of the ephedrine on his mental state may have triggered a more severe manic episode than anything he suffered in the past. However, Dr. Terrell relied on defense counsel's background information about Metabolite, and he never asked appellant about his use of the dietary supplement or how many pills he had taken.

Dr. Terrell explained that herbal or dietary supplements are harmful, particularly to people who already have psychiatric problems. The ephedrine in the supplement could make a person's manic depression much worse, and result in very dangerous or life threatening situations. Ephedrine is basically a stimulant, which is something a manic depressive should not be taking.

Dr. Terrell testified that appellant's use of Metabolite, and the ingestion of the ephedrine, probably worsened his manic depression. Dr. Terrell believed appellant's use of Metabolite was a

32

factor, but it wasn't a huge factor that should be "obsessed. upon or overly focused on, because I believe the man was a manic depressive long before" he took the dietary supplement. He couldn't say for certain the supplement played any part in appellant's behavior, but there might have been a temporary relationship "between taking it and what appears to be the worse psychotic and manic episode of his life." "I'm just saying there is a temporal relationship and there is some literature to support that [the supplement] can worsen his condition."

Dr. Terrell carefully examined appellant's past and his conduct in this case, to determine if he was a chronic pedophile committing "business as usual" or if his acts were something grossly abnormal and out of character. Dr. Terrell believed appellant's behavior was not consistent with a true pedophile because there would be a lifelong pattern with other victims coming forward after his arrest. Most pedophiles operate through seduction rather than force or violence, and establish trust and friendships with their victims. A smaller number of pedophiles are sociopathic, violent, and sadistic, and usually kill their victims. However, such individuals are also very mean people in general, aside from their criminal conduct, and usually lie about their behavior rather than attempt suicide when caught.

> "To my understanding, this is the first and only time that anyone is aware of him ever molesting a child at any time. [§] If it turns out that we have victims coming out, coming forward and noting that they were also molested by him, then I would be prone[] to think that we're dealing more than with just a chronic pedophile who is also manic depressive, other than what I believe is a manic depressive and did something psychotic, that did something extremely out of character for himself. Because manic depressives many times act outrageously out of character."

However, Dr. Terrell was not willing to say, unequivocally, that appellant was not a serial pedophile. His opinion was based on the lack of evidence that appellant previously molested children or committed other sex crimes.

Dr. Terrell believed appellant was not malingering when he said that he lacked any memory of the instant offenses. While he couldn't be sure, Dr. Terrell testified appellant was "up front with me when he told me he could not remember those particular portions of the incident." Appellant's

33

1  memory loss could also be the result of his serious injuries and head trauma, the shock of realizing

2  what happened to him, and/or the effect of the ephedrine on his bipolar disorder.

3          Dr. Terrell testified that manic depressives often become hypersexual. He noted that

4  appellant had become obsessed with having anal sex with his wife. In addition, a sexual assault

5  victim could sometimes identify with his aggressor. Appellant committed crimes which seemed like

6  bizarre and psychotic recreations of his own victimization. Such conduct was not unusual for

7  molestation victims suffering from abnormal psychiatric problems. Their psychiatric problems cause

8  them to break down their social inhibitions to where they act out the role as the aggressor, just like

9  the person who victimized them.

10         Dr. Terrell also explained that appellant's employment history was consistent with manic

11  depression, given his shift from being a deputy, to a chiropractor, to wanting to sail around the world

12  working on refrigeration units.  Manic depressives cycle up and down like a yo-yo.

13              "Like establishing a practice where you've got a wife and two
                young children and you're settling into a community and all of a
14              sudden you want to chuck it all and jump on a sailboat and sail around
                the world. That might be okay in someone's fantasy, but to really want
15              to do that is much more typical of a manic depressive than a normal
                person. [1]  And so these ideas of getting into something and then
16              jumping out of it and being impulsive -I think earlier in his life, I think
                he worked as a peace officer, and I think he had gone solo and took off
17              and spent four months or so traveling around Europe. That may be
                great for most of us in our fantasy lives. But most people don't do it."
18

19  Appellant's impulsiveness, and just doing things on a lark without much consideration, "does not

20  make too much sense to too many people unless you have the mind of a manic depressive."

21  Appellant's symptoms were consistent with being a rapid-cycler, whose manic and depressive stages

22  changed over hours or days.

23         Dr. Terrell testified appellant's spotty memories were consistent with someone suffering from

24  a psychotic mental disorder, in that he could only recall bits and pieces of his emotions and feelings.

25  Dr. Terrell believed appellant lost contact with reality during this episode, and he was suffering from

26  auditory hallucinations. Dr. Terrell conceded appellant's claim of amnesia could be self-serving and

27  he could be malingering, but it was also consistent with symptoms of manic depression. "It is still

28  possible it may be malingering. It may be he is floundering. I don't claim to be a human lie detector.

34

1  Believe me, I have given this case an awful lot of time and thought in review."

2      Dr. Terrell explained that just because someone is manic does not mean he does not know the

3  wrongfulness of his actions, and it does not mean the person does not understand the nature and

4  quality of his actions. In addition, a person can be manic without experiencing psychosis or loss of

5  reality, and a person can be psychotic without being manic. "But what I can tell you is he does appear

6  to suffer from a genuine mental illness. And the behaviors and actions appear to have been consistent

7  with 'a manic and psychotic episode. And more likely than not, I think he probably did not

8  understand the wrongfulness. I can't say so for sure."

9              "Because it appears to be an episode that was in a psychotic
               phase. It appears to be grossly, grossly out of character for him.
10             Grossly out of character. And inconsistent for the type of sexual
               assault that I would expect for someone who truly was a homosexual
11             pedophile who would actually kidnap a child at gunpoint ... or anally
               molest a child. The issue of not proceeding forward and, you know,
12             ripping the child's rectum to shreds. Asking for directions in an area
               where he apparently grew up and been a police officer. And just a
13             whole lot of bizarre, strange things that make me feel that it is more
               likely than not that he was so psychotic that he did not comprehend the
14             wrongfulness."

15

16     Dr. Terrell conceded appellant's actions appeared to be specific, goal-oriented conduct, and

17  he was successful in getting the children into his vehicle. However, psychotics can perform the

18  most bizarre delusions that would otherwise be perceived as goal-oriented behavior. He did not

19  consider appellant's police disguise out of the ordinary, even though it was obviously used as a ruse

20  to lure the children into the van. Dr. Terrell conceded appellant never really explained why he had

21  these items and it was plausible appellant used this disguise on other occasions, but he had no

22  evidence that appellant committed any crimes before this incident.

23     Dr. Terrell also conceded it was very bizarre for appellant to fire at the two men who were

24  trying to save the children, because such violence was out of character for him. The shots were fired

25  at very close range and it was bizarre that he missed anyone, given his experience and training as a

26  deputy. "Again, it is during the particular time period where I believe the man was manic and

27  psychotic." Appellant was recreating his own similar victimization.

28     The court asked Dr. Terrell about appellant's conduct in removing the van's license plates and

35

placing them inside the vehicle. Dr. Terrell conceded such conduct showed "there was more thought and premeditation in terms of planning to conceal his identity by concealing the license plates. So that -- that certainly may have indicated that he either understood the illegalness or possibly the wrongfulness of his actions." However, a person can act purposefully and with subterfuge but still be acting within a state of psychosis.

**PROSECUTION'S SANITY PHASE EVIDENCE**

The prosecution presented several experts who testified appellant was not legally insane at the time of the offenses.

Dr. Avak Howsepian was the primary prosecution expert. He is a board-certified psychiatrist (not a board-certified foresenic psychiatrist) whose caseload includes patients suffering from schizophrenia, psychotic and bipolar disorders, posttraumatic stress syndrome, and sexual dysfunctions. He interviewed appellant for three hours, and spoke to appellant's wife for two and one-half hours. He also reviewed the reports of the other experts in this case. This case was Dr. Howsepian's first court-ordered evaluation of a subject pleading insanity, but he had performed competency evaluations of patients who had refused medical treatment.

Dr. Howsepian determined appellant was legally sane when he committed the offenses, and he knew the nature and quality of his acts and was able to distinguish right from wrong. Dr. Howsepian extensively explained his reasons for rejecting the conclusion of the defense experts that appellant suffered from bipolar or manic depressive disorder, and rejecting the defense theory that Metabolite triggered an extreme psychotic or manic episode which led to the instant offenses.

Dr. Howsepian testified appellant was suffering from stress from his business and financial concerns at the time of the instant offenses. However, appellant's most significant stress centered around his sexual life with his wife and his impulsive interest in anal sex. Appellant explained he suffered from dreams and flashbacks about being sodomized as a child, and that started his preoccupation with anal sex. The impulses created a prominent barrier in his marriage and precipitated their going to counseling. Appellant told Dr. Howsepian his interest in anal sex "`became everything" and it was "`eating me alive.'" When his wife refused to participate in these sexual acts, he felt a "`crushing sense of failure.'"

1    Dr. Howsepian determined appellant and his wife had very different views about the impact

2   of this impulse on appellant, and appellant was not always honest with him on this issue. For

3   example, appellant and his wife gave different answers as to whether they actually engaged in anal

4   sex, and appellant said he didn't know whether he fully performed the act. Appellant's wife also said

5   the issue was resolved after counseling, but appellant disagreed with that assessment. Appellant said

6   he was like an alcoholic with respect to this problem, "[a]lways apologizing for it after he would

7   make his attempts."

8    Appellant also said that for about five years prior to the offenses, he began to masturbate in

9   an increasing and compulsive fashion, and his wife didn't know about it. Appellant claimed he did

10  not think about anything in particular and minimized the sexual nature of the acts. However, Dr.

11  Howsepian explained appellant was driven toward this activity in a compulsive manner and he gave

12  in to it, which meant he had a certain vulnerability "to do things in this more robotic and mechanical

13  sense." Appellant's descriptions of his conduct "sound like they're almost mini-dissociative types of

14  episodes," and showed he could be vulnerable to "larger scale dissociative [episodes]."

15  Appellant denied having homosexual experiences or fantasies. When Dr. Howsepian asked if he

16  had physical relationships with men, appellant became anxious and said, "`I don't know'" then

17  stated, "`Maybe I got scared and backed away from it.'" Dr. Howsepian felt appellant's responses

18  indicated he had homosexual impulses that were not being acknowledged.

19   Based on these circumstances, Dr. Howsepian believed appellant suffered from a sexual

20  disorder which caused distress, interfered with his life, and impaired his relationship with his wife.

21  Appellant's sexual disorder was the result of his "certain appetites for anal sex that weren't shared by

22  his wife." Appellant also admitted that he had other conflicts with his wife, and said she was hurtful

23  with her words and he felt she was too good for him. The trip to Madera for Thanksgiving was his

24  wife's idea, and appellant reluctantly went along. Some of appellant's fragmentary memories of that

25  week also suggested there was marital discord.

26   Dr. Howsepian testified appellant's memory loss could be attributable to the head trauma

27  from the accident, but his retrograde amnesia seemed to be longer than in most head injury cases.

28  Appellant's amnesia could have also been the result of his dissociative responses to what he had

1 done. Dr. Howsepian believed appellant did not truly remember several things about the offenses for

2 dissociative reasons, but malingering was another possibility that could not be ruled out.

3      Dr. Howsepian discounted the impact of Metabolite on appellant's commission of the instant

4 offenses, and the dietary supplement wasn't significant as to his ability to know the nature and quality

5 of his acts. Appellant said the Metabolite pills made him jittery and anxious. Such feelings were

6 consistent with being caused by the stimulants in Metabolite, including ephedrine, caffeine, and

7 ginseng. These stimulants can also increase an individual's sex drive, or cause a person to become

8 paranoid or delirious. However, Metabolite had less caffeine than a cup of coffee. Appellant said he

9 seldom drank coffee because it kept him awake. So while appellant could be more vulnerable to a

10 stimulant than other people, his vulnerability was limited to insomnia and feeling nervous rather than

11 mania and delirium. When someone with a bipolar disorder stays up all night, they have a very high

12 probability of "flipping into a mania, not a depressed dysphoric kind of feeling terrible kind of mood

13 that is then, after a good night sleep ... is vanguished again. That is precisely not the kind of pattern

14 you would see on a bipolar disorder patient." Appellant's ingestion of Metabolite could have

15 increased his sex drive and removed his inhibitions.

16      Dr. Howsepian disagreed with the opinions of Dr. Estner and Dr. Terrell as to the effect of

17 Metabolite on appellant, primarily based on appellant's "highly deliberate" and "very organized"

18 conduct.

19      "Before the actual crime, and in the process of committing the crimes, he was very deliberate, very purposeful, very much in control

20 of himself and the situation. He exhibits no kind of psychiatric disorganization, no disorganization of his speech or this behavior.

21 Things that you must see, it seems to me, to say that someone is either manic or psychotic, in the sense that it's in question, is a psychosis

22 connected it to some kind of mania ... or delirium. People with those kind of episodes are very disorganized, they're disorganized

23 conceptually, disorganized in their behavior ... in a way that wasn't at all reflective in how the witnesses accounted for these events

24 leading up to and including the sexual assault.

25      "... [T]here is just no evidence for those kinds of diagnostic considerations. The only evidence that one can point to is the fact that

26 this event happened, it was kind of an aberration. But that itself isn't enough. And there is -- there must be certain surrounding kinds of

27 symptoms, behaviors that we just don't see.

28      "So I'm fairly confident that ... there's not a kind of manic episode with or without psychosis or a delirium that was caused by this

[Metabolite] supplement in this case."

Appellant's deliberate conduct "couldn't conceivably be the product of a manic kind of behavior, or a mania with psychosis or delirium."

Dr. Howsepian was highly skeptical that a bipolar disorder had anything to do with appellant's commission of the offenses. Dr. Howsepian testified that based on appellant's conduct and sleep patterns prior to the offenses, his conduct before the incident was clearly not manic. "This is a quiet, brooding, angry, isolating, withdrawn guy. That is not mania, that is for sure." If there was any mania, it would have occurred on the day of the crimes. However, there was no evidence from the victims or witnesses of any manic or disorganized behavior when appellant committed the crimes. The more disorganized behavior occurred after the crimes, which was more consistent with a dissociative reaction, "someone who had done something really horrible, knows it, at some level, and just fragments." Dr. Howsepian disagreed with Dr. Terrell's opinion that someone can flip in and out of manic episodes within a few hours, and testified that such instances are very rare. Instead, manic episodes typically last at least one week, and even three to six months.

Appellant's description of his memories and feelings during the offenses- was consistent with dissociation, based on his lack of integration of identity, perceptions, consciousness and memory, but he did not display the lack of insight which was consistent with psychosis. Dr. Howsepian closely questioned appellant about whether he heard voices during the offenses, and appellant admitted he did not hear voices telling him to kill and fight. Instead, appellant admitted those were feelings or thoughts that seemed to come from inside of him, and he felt like he was drowning. "And he said that the only way out was take my own life. If I didn't do anything, I would be lost forever...." These were classic dissociative experiences, and a borderline personality patient was vulnerable to dissociations and paranoid ideation under stress. "And there was no bigger stress in his life than these events having happened. So this is, I think, very much understandable."

Dr. Howsepian rejected the possibility that appellant was bipolar because there was no evidence of a marked impairment in his interpersonal and social functioning. Instead, the absence of a marked impairment was more consistent with cyclothymia. The difference between the two

disorders was the degree and duration of the person's impairment. Dr. Howsepian believed appellant suffered from cyclothymic disorder, a mild form of mood swing disorder. A person with cyclothymic disorder has highs and lows, but their mood swings are not as intense as a person with bipolar disorder, and the person would not suffer psychotic episodes. The milder mood swings would not significantly interfere in their life. Appellant's condition was best explained by cyclothymic disorder along with borderline personality disorder, in which the person becomes dissociative and paranoid under stress.

Dr. Howsepian conceded that appellant's conduct could be better explained if he was actually molested as a child:

> "And so the crimes and how they came about and his preoccupation with anal sex, and the ... fact that he sent the kids into a barn, which is evidently where the assault took place when he was eight ... and the fact that he has a borderline personality disorder, which is often linked to childhood traumas as well, given all that, it makes the story of molestation, it gives it some substance in the context of all this stuff."

Appellant was not a monster, but an individual with very deep and significant problems who struggled against them "heroically'.' for quite a long time, and may have given into them.

Dr. Howsepian conceded it was possible to become psychotic and reenact past trauma, but someone can have suicidal urges without being bipolar. However, a psychotic person would not have the same insight as appellant, when he realized he was going to hurt someone if he did not stop himself. When he was being chased by the, helicopter, appellant knew he did something wrong but didn't know what it was, but such thoughts were not consistent with someone who is paranoid or psychotic as a result of mania. Paranoids believe they have not done anything wrong but people are after them for some other reason. But a paranoid, psychotic individual would not think they had done something wrong.

Dr. Howsepian testified appellant was legally sane based on the manner in which he committed the instant offenses, and he reviewed the factors which supported this opinion. Appellant planned and executed a series of events in a certain order, and there was no evidence of peculiarities or disorganization in his speech or conduct. Appellant's use of Metabolite was not critical to the

incident as evidenced by his reaction to ingestion of caffeine. When he drank coffee in the past, he was simply unable to sleep and he never flipped into a psychotic episode or manic conduct. Appellant's conduct during the offenses also discounted the possibility he was in a manic or psychotic episode. He was emotionally withdrawn and angry before the crimes, methodical and deliberate during the crimes, and disorganized in behavior and impaired in his cognitive functions afterwards. He walked and didn't run, he didn't behave in an unusual fashion, and he was organized as he kidnapped the victims. He didn't dress in flashy, colorful clothes or in a disorganized fashion, which manics often do. He used his badge to exert authority, and asked and wrote down personal information. He was able to cuff, uncuff, and again cuff the second victim in the back of the van to restrain him during the sexual assault.

Appellant was also organized and deliberate as he sexually molested the victim. He commanded the boy to unbuckle his pants rather than doing it himself, which was consistent with appellant acting out an erotic fantasy rather than being in a psychotic or manic state. Based on Dr. Howsepian's review of the police reports, appellant placed a towel on the ground, put on gloves and a condom, and specifically directed the. victim to perform specific sexual acts. Nothing was done to excess or with haste or disorganization. Everything was done methodically, in a well-organized and well planned fashion. "You just don't see behavior like this is manic or delirious patients" who usually "take off all their clothes and run all over the place."

Dr. Howsepian particularly pointed to appellant's removal of the license plates from the van as further evidence which discounted manic or psychosis. Appellant's language was "especially striking" because there was no indication his speech was disorganized or overproductive, and there was no evidence of cognitive disorganization. "Just the opposite. Very well-organized, very goal-directed, and very sensitive to the subtleties of the examinations. For example, he used a simile when he told the victim to suck his penis like sucking a straw, just to persuade a child to understand something with a simile. He knew to threaten a child not to talk with a gun to his forehead, quote,

41

1  `Or else you will never see your mom again.[9]

2      Dr. Howsepian concluded appellant's goal-oriented conduct and direct commands, given in

3  the proper order, exhibited a high degree of planning and organization. "[A]ll these sorts of things

4  are just not the kinds of behavior that you see in a manic patient, not the kind you see in a delirious

5  patient. This is inconceivable."

6      The court asked Dr. Howsepian to assume appellant was bipolar and in a manic state when he

7  committed the offenses, and asked whether he was legally sane under such circumstances. Dr.

8  Howsepian replied appellant would have still been able to understand the nature and quality of his

9  acts and know right from wrong even if he was in a manic state when he committed the offenses.

10  "Because of the progression of events as reported by the witnesses, regardless of what these

11  diagnoses were at the time, shows me he knew and understood the quality and nature of his act and

12  that he knew right from wrong;" Dr. Howsepian testified appellant's conduct was not manic, even

13  though he had never engaged in such acts before this incident. "Because there are times at which

14  things build up to a point, stresses build up to a point that a person could end up doing something

15  very much out of character, not be psychotic when they do it, not be manic when they do it. Not be

16  wanting to do it." Aberrant conduct is not solely caused by a psychotic episode, and stress can lead a

17  person to behave out of character without being a psychotic state.

18      Dr. Frank Powell and Dr. Susan Anderson also testified for the prosecution. Dr. Powell, a

19  psychologist, received the same history from appellant as the defense experts, in that appellant had

20  spotty and fragmented memories of Thanksgiving week and the day he committed the offenses. Dr.

21  Powell also reviewed the reports from the other experts in this case. Dr. Powell could not determine

22  if appellant's memory loss was legitimate or malingering, but believed his amnesia was probably

23  from the head trauma suffered in the accident.

24      Dr. Powell determined appellant suffered from bipolar disorder and was manic depressive.

25  He also suffered from episodes of mania and cycles of depression. Dr. Powell's diagnosis was based

26

27      [9] In rebuttal for the defense, Dr. Terrell strongly disagreed with Dr. Howsepian's opinions, and testified appellant's episodes of depression and mania were too severe to constitute cyclothymia.  Dr. Terrell reiterated his opinion that appellant was a rapid cycling manic depressive, that a manic can behave in a premeditated manner, and such actions can be fueled by delusional disorders.

28

on the history appellant gave him, that he had periods of being depressed in which he had difficulty functioning. He had no pleasure in life and had difficulty focusing on work. Appellant's periods of depression lasted longer than his periods of mania.

Dr. Powell concluded appellant was legally sane at the time he committed the offenses, that he had knowledge and understanding of what he was doing and knew the difference between right and wrong. His opinion was based on the police reports and the children's statements about the incident, which revealed planned, sequential behavior rather than chaotic acts. Appellant used a cover story to approach the children, and understood the need to escape, "thereby demonstrating, I think, that he appreciated that what he had done was wrong."

Dr. Powell conceded appellant's conduct appeared to be an aberration from his reputation, and he had been an "undiagnosed ... bipolar for most of his life." He also conceded that manic depressives can become very psychotic and behave strangely. In his experience, however, people who are in a psychotic episode later have some memory of the events when they are medicated and stabilized.

Dr. Powell also testified that people who are molested as children are "very apt" to become molesters themselves, just as people who have been physically abused as children will beat their own children.

Dr. Powell explained that a manic depressive in the midst of a manic episode may be unable to appreciate the nature and quality of his acts if he was so manic and psychotic that he lost all contact with reality. It was necessary to review the entirety of the circumstances of what that person did during the manic episode to determine if that person was legally insane. In this case, Dr. Powell reviewed the police reports and determined appellant was legally sane when he committed the offenses, based on the manner he committed the offenses.

Dr. Anderson, a licensed clinical psychological, testified appellant suffered from dissociative amnesia, based on his inability to remember the traumatic events when he committed the offenses. The head trauma from the accident would have only led to temporary amnesia. She believed appellant had symptoms of depression, and possibly cyclothymia or a bipolar disorder. However, Dr. Anderson testified appellant did not suffer from bipolar disorder because there was no evidence of a

significant impairment in his social or occupational functioning over a pattern of time. She did not

believe the Metabolite had any impact on his condition. Dr. Anderson testified she did not have

enough information to determine whether appellant understood the nature of his conduct, but he did

not appear to suffer from a mental disorder and he seemed to be aware of right and wrong. Dr.

Anderson agreed that deviant behavior does not imply a person has no control over his behavior, or

that he does not know what he is doing. However, it is possible a person could act purposefully and

be goal-oriented and not know what he was doing.

### Sanity verdict and sentence

The court was satisfied that appellant was mentally ill and suffered from a bipolar disorder

when he committed the offenses. The court appreciated the circumstances of appellant's life and

conduct, his physical and psychological conditions, and was "mindful of the humanitarian issues that

apply in this case." However, the court found the "mental illness which you clearly suffer from does

not necessarily equal legal insanity." The court reviewed the circumstances of the offenses and

appellant's conduct before and after the crimes, and found it "simply uncontradicted, virtually

uncontradicted that you engaged in conduct which demonstrated a design to both avoid detection and

apprehension by law enforcement authorities. I'm simply satisfied, sir, from all the evidence that I

have heard here that it has been shown by a preponderance of the evidence that you knew right from

wrong during the commission of each and every one of these crimes and you appreciated the nature

and quality of your acts." The court found appellant was legally sane when he committed the

offenses. The court acknowledged it was not required to make specific findings in the case, but it

specifically made findings "for a very good reason," because "at the very least" the court wanted the

parties to consider the court's findings for purposes of the sentencing recommendations.

Appellant subsequently moved for reconsideration and/or a new trial. In the course of the

motion, appellant asserted that a life sentence to the California Department of Corrections (CDC)

would be cruel and unusual punishment, and there were alternatives to "warehousing" him until his

death. Appellant urged the court to minimize the suffering of a "bewildered defendant and his

devasted family," given his mental and physical conditions.

The prosecution opposed the motion for reconsideration and asserted the guilt and sanity

1    verdicts were supported by substantial evidence. However, the prosecutor acknowledged that

2    "everyone involved" understood the "human tragedy" embodied in appellant's case. The prosecutor

3    also acknowledged appellant's physical limitations, and did not want to propose "an inhumane

4    placement."

5           At the sentencing hearing, the court denied appellant's motions for reconsideration and/or

6    new trial, and found the verdicts were not contrary to the evidence. The court noted that while

7    appellant may be suffering from a mental disorder, that fact did not mean he was legally insane when

8    he committed the offenses. The court particularly cited appellant's threats to the children that he

9    would kill them unless they gave a misleading description of him. The court rejected the opinions of

10   the defense experts that the description he gave to the children was similar to appellant's actual

11   appearance. Instead, the court found appellant's threats about the misleading description

12   demonstrated he knew right from wrong: "[I]t was clear from his statements to the children that he

13   wanted them to lie and to say something different than, other than what had occurred about who he

14   was. Which demonstrated to this Court that he understood right from wrong and that the nature and

15   quality of his acts were such that he would likely be arrested if caught by the police in this matter."

16          As for the sentencing, defense counsel again asserted that a prison sentence would be cruel

17   and unusual punishment because of appellant's serious physical and mental conditions. Defense

18   counsel spoke to various authorities within the CDC and tried to determine whether appellant could

19   be placed at the state hospital. However, no one., was sure about the appropriate custodial setting for

20   appellant given his mental and physical conditions, in light of the sanity verdict.

21          The court acknowledged the great tragedy presented by this case, but noted appellant's

22   conduct "strikes at the heart" of every parent. "And because of that, sir, as your attorney has

23   mentioned here, this Court has really no choice, although I agree with the law, to deny probation.

24   Probation is inappropriate for the offenses which you stand convicted."

25          As to count III, forcible sodomy of C., the court imposed a life term, without eligibility for

26   parole for 25 years, pursuant to section 667.61, subdivision (d)(2). As to count IV, forcible oral

27   copulation of C., the court again imposed a life term without eligibility for parole for 25 years, to

28   run concurrent to the term imposed for count III.

As to count I, kidnapping of C. with intent to commit sodomy, the court imposed a life term with the possibility of parole, with the mitigated term of three years for the firearm enhancement, and stayed the terms pursuant to Penal Code section 654.

As to count VI, attempted murder, the court found the offense to be wholly separate from the other offenses, and imposed the mitigated term of five years, to run consecutive to the other terms. The court selected the mitigated term based on appellant's lack of a criminal record. The court imposed an additional term of 20 years for the firearm enhancement. The total term for count VI was 25 years, which the court designated as the principal determinate term.

As to count VII, attempted murder, the court found the offense was wholly separate from count VI because it involved a different victim, and imposed seven years, with a consecutive term of two years, for a consecutive term of nine years.[footnote omitted.]

As to count II, kidnapping of A., the court imposed the mitigated term of five years pursuant to section 208, subdivision (b), plus the midterm of four years for the firearm use, for a total of nine years, to be served concurrently.

As to count V, assault with a deadly weapon on C., the court imposed the mitigated term of two years, plus the mitigated term for the firearm use, to be served concurrently.

The court determined appellant's aggregate determinate term was 34 years, plus life without possibility of parole for 25 years.

Finally, while the court remanded appellant to CDC, it specifically retained jurisdiction of the matter for 120 days for the following reasons: "Meaning that depending upon what the California Department of Corrections decides to do concerning placement of you, if they place you in one of their hospitals or something to that effect, you can, through your attorney, ask to come back and have the Court reconsider that placement to the extent that I have any authority over that issue." There is no indication in the instant record as to CDC's placement of appellant, or whether the matter returned to the trial court for further discussions as to appellant's placement.

On appeal, appellant contends counsel was prejudicially ineffective for submitting the guilt phase on the preliminary hearing transcript. Appellant also raises several sentencing issues.

///

46

1   DISCUSSION

2   A.      Jurisdiction

3           Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

4   to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

5   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

6   375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

7   guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Fresno County

8   Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

9           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

10  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

11  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499

12  (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97

13  F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other

14  grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable

15  to cases filed after statute's enactment).  The instant petition was filed after the enactment of the

16  AEDPA and is therefore governed by its provisions.

17  B.      Standard of Review

18          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

19  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

20  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

21          The AEDPA altered the standard of review that a federal habeas court must apply with

22  respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

23  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will

24  not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or

25  involved an unreasonable application of, clearly established Federal law, as determined by the

26  Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable

27  determination of the facts in light of the evidence presented in the State Court proceeding." 28

28  U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

47

approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

Because the California Supreme Court's opinion is summary in nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

C.    Ineffective Assistance of Counsel During Sanity Phase of Trial

Petitioner contends that trial counsel provided ineffective assistance by failing to present expert testimony based upon certain published reports regarding the link between ephedrine and serious health consequences including psychosis.  Petitioner contends had counsel fully researched

1  the available psychiatric side effects of ephedrine, he could have demonstrated a casual link between

2  the use of ephedrine and psychosis.

3      Petitioner presented this claim to the California Supreme Court in a petition for writ of

4  habeas corpus, filed June 29, 2004.  (Lodged Doc. No. 6., at 28-34.)  The petition was denied

5  without comment on July 20, 2005.  (Lodged Doc. No. 7.)  The court looks to the last reasoned state

6  court decision as to the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th

7  Cir. 2002) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991)).  Where, as here, the state court

8  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas

9  court independently reviews the record to determine whether habeas corpus relief is available under

10  section 2254(d).  Delgado v.  Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

11      The law governing ineffective assistance of counsel claims is clearly established for the

12  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151

13  F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance

14  of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104

15  S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must

16  show that counsel's performance was deficient, requiring a showing that counsel made errors so

17  serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

18  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an

19  objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were

20  not the result of reasonable professional judgment considering the circumstances. Id. at 688; United

21  States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's

22  performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls

23  within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104

24  S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

25      Second, the petitioner must show that counsel's errors were so egregious as to deprive

26  defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

27  also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

28  ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  Thus, "[j]udicial scrutiny of counsel's performance must be highly deferential."  Id.  "The test is not whether another lawyer, with the benefit of hindsight, would have acted differently, but whether 'counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998) (citing Strickland, 466 U.S. at 687, 689.) Stated differently, "the relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."  Babbitt v. Calderon, 151 F.3d at 1173 (citing Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998).

"In determining whether counsel's conduct falls within the broad range of professionally acceptable conduct, a reviewing court should not view counsel's actions through 'the distorting lens of hindsight.'"  Hendricks v. Calderon, 70 F.3d 1032, 1036 (9th Cir. 1995) (citing Deutscher v. Whitley, 884 F.2d 1152, 1159 (9th Cir. 1989), vacated on other grounds, Angelone v. Deutscher, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991).  "Rather, under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices."  Id.

At the sanity phase of the trial, the determination is not whether the defendant committed the act, but whether or not he should be punished.  People v. Flores, 55 Cal.App.3d 118, 121 (1976).

1   Under California law, the defendant is insane if he is incapable of knowing or understanding the

2   nature and quality of his act and of distinguishing right from wrong.  § 25(b);  People v. Hernandez,

3   22 Cal.4th at 520;  People v. Phillips, 83 Cal.App.4th 170, 173 (2000).  The defendant bears the

4   burden to prove by a preponderance of the evidence that he was insane at the time of the offense.

5   People v. Flores, 55 Cal.App.3d at 121;  People v. Hernandez, 22 Cal.4th at 521.

6          Attached to his state petition for writ of habeas corpus filed in the California Supreme Court,

7   Petitioner attached the declaration of Dr. Albert Globus, indicating that at the time of Petitioner's

8   trial research was readily available to demonstrate the serious health-related side effects of

9   ephedrine, including psychosis.  Dr. Globus contends that the literature would have "reinforced the

10  findings of Drs. Estner and Terrell on the occurrence of psychosis to explain [Petitioner's] behavior,

11  thinking, and feeling as consistent with a typical psychotic distortion of reality.  Under these

12  findings, the most probable medical or psychiatric interpretation would be that the ephedrine induced

13  a psychotic episode, which would be particularly serious and dangerous in a person with a pre-

14  existing bipolar affective disorder or chronic depressive condition."  Lodged Doc. No. 6;

15  Declaration, at 7.  Dr. Globus points to a report issued in February of 2003, Rand Report, Ephedra

16  and Ephedrine for Weight Loss and Athletic Performance Enhancement: Clinical Efficacy and Side

17  Effects.  Dr. Globus also points to the article entitled Disposition of Toxic Drugs and Chemicals in

18  Man by Randall C. Baselt, Ph.D., fifth edition (published in 2000) or fourth edition (published in

19  1995) revealing that ephedrine was the cause of toxic psychosis.

20         The various experts differed as to their opinion of whether the taking of Metabolife played a

21  role in Petitioner's actions.  Defense expert Dr. Miles Estner, a board certified forensic psychiatrist,

22  opined that Petitioner suffered from manic depression and reasoned that the combination of the

23  ephedrine-containing compound in the herbal diet supplement and his predisposing manic depression

24  and post-traumatic symptoms could have caused him to "come unglued" under the influence of the

25  medication.  (RT 1910.)  He believed the ephedrine caused a kind of psychosis in which Petitioner

26  was "not fully aware and not really fully recording events as they [took] place."  (RT 1912.)  Dr.

27  Estner acknowledged that no toxicology tests were performed on Petitioner and a blood screening

28  would likely have shown the presence of ephedrine in Petitioner's bloodstream.  (RT 1933-35.)

1    Second defense expert, Dr. Howard Terrell, also a board certified forensic psychiatrist,

2    opined that Petitioner was manic depressive, and that at the time of the offense he was severely

3    psychotic and Metabolife may have precipitated a severe manic episode.  (RT 2012.)  Dr. Terrell

4    opined that Metabolife was not "a huge factor that should be obsessed upon or overly focused on,

5    because I believe the man was a manic depressive long before he ever took Herbal Life.  But it is my

6    concern, I believe the Herbal Life, based on what I have read in the literature and some of the

7    components in it, that some of these components can potentially worsen pre-existing manic

8    depressive illness.  So, again, not to blame everything on Herbal Life, but to try and explain to Mr.

9    Christensen and anyone else how he may have had a more severe and manic psychotic episode than

10   he had in the past without the Herbal Life.  Basically making a bad situation worse, I believe."  (RT

11   2036.)  Dr. Terrell conducted a fair amount of research regarding the effects of the herbal

12   supplement.  (RT 2039-2040.)  With respect to his research, it was asked "doesn't the literature that

13   you reviewed speak of the adverse effects of these - - of this compound or of specific ingredients of

14   it, either in terms of a chronic use or at toxicity levels?," which he answered "I think that would vary

15   article by article.  We have to look at each one if you want to address that.  (RT 2049.)

16   Prosecution expert, Dr. Avak Howsepian, a psychiatrist whose caseload includes patients

17   suffering from schizophrenia and other psychotic disorders, bipolar disorder, post-traumatic stress

18   disorder and other difficulties, including sexual dysfunction.  (RT 2387-2389.)  Dr. Howsepian is not

19   a board-certified forensic psychiatrist.[10]  (RT 2492.)  Dr. Howsepian interviewed Petitioner for

20   several hours and spoke to Petitioner's wife for a couple hours.  (RT 2390-2392.)  He also reviewed

21   the testimony of Drs. Estner and Terrell before testifying.  (RT 2392-2393.)  It was Dr. Howsepian's

22   opinion that Petitioner's criminal conduct did not result from a manic psychotic episode or as a result

23   of delirium based on the use of the herbal supplement.  Rather, the deliberate, purposeful, and

24   controlled conduct before, during, and after the offense was not consistent with a psychotic episode.

25   (RT 2410-2411.)  The mere fact that Petitioner's actions were an aberration is not sufficient to

26

27        [10]  Dr. Howsepian evaluated Petitioner to provide the Court with his opinion regarding Petitioner's sanity at the time
     of the offense.  This was Dr. Howsepian's first section 1027 court-ordered evaluation of a subject pleading insanity.  (RT
28   2390-2391.)

1   demonstrate mania.  (RT 2411.)  Dr. Howsepian concluded that Petitioner knew the nature and

2   quality of his acts and was able to distinguish right from wrong when he committed the crime.  (RT

3   2490-2491.)  Further, in response to the court's question, Dr. Howsepian stated that even assuming

4   Petitioner was in a manic state when he committed the crimes, Petitioner still understood the nature

5   and quality of his acts and knew right from wrong.  (RT 2554.)  He stated that it is not true that

6   aberrant conduct must be caused by a psychotic episode; stresses can cause a person to behave out of

7   character without the person being in a psychotic state.  (RT 2556.)

8          Drs. Frank Powell and Susan Anderson, both psychologists, also testified regarding

9   Petitioner's sanity.  (RT 2340, 2438.)  Dr. Powell opined that Petitioner suffered from manic-

10  depressive disorder.  However, he believed Petitioner was legally sane at the time of the offense,

11  based on the fact that Petitioner acted in a planned, sequential manner.  (RT 2351, 2355.)

12         Dr. Anderson, who sits on a panel that evaluates defendants to determine whether they should

13  be found not guilty by reason of insanity, was not able to determine whether Petitioner was legally

14  insane at the time of the offense, i.e. whether he understood the nature of his actions at the time of

15  the crimes.   She opined that it did appear that Petitioner did not have a mental disorder and he knew

16  right from wrong.  (RT 2450.)

17         First, it is noteworthy that this is not a case where counsel failed to make a reasonable

18  investigation into a possible insanity defense.  Rather, trial counsel consulted numerous experts,

19  provided them with relevant information, and obtained their opinions.  As previously stated,

20  Petitioner claims and submits evidence in the form of further research attempting to establish a

21  connection between the ingestion of ephedrine and psychosis.  The fact that now in hindsight other

22  additional research was available to support the claim that ephedrine caused psychosis, does not

23  undermine counsel's reasonable actions taken before and during trial.  This is simply not a case

24  where counsel utterly failed to discover or present any evidence as to Petitioner's mental insanity

25  defense, which has in several instances been found to be deficient performance.  See e.g. Douglas v.

26  Woodford, 316 F.3d 1079 (9th Cir. 2003) (during penalty phase in capital case, counsel failed to

27  discover evidence supporting a defense of mental capacity and no defense was raised); Evans v.

28  Lewis, 855 F.2d 633, 637 (9th Cir. 1988) (during penalty phase in capital case, counsel's failure to

1   investigate defendant's mental condition when there is evidence of impairment constitutes deficient

2   performance, and is prejudicial when it hampers later presentation of evidence of mental

3   impairment); Deutscher v. Whitley, 884 F.2d 1152, 1160-61 (9th Cir. 1989), vacated on other

4   grounds sub.nom. Angeleone v. Deutscher, 500 U.S. 901 (1991) (during penal phase of capital case,

5   counsel failed to present any evidence of petitioner's mental problems).  To the contrary, Petitioner's

6   trial counsel presented not one, but two expert witnesses, and as Petitioner concedes, provided Dr.

7   Estner with some internet research, including a letter from an editor which referred to various articles

8   which referenced the side effects of ephedrine. (RT 1963, 1991.)  Dr. Estner testified as to his own

9   experience of patients he had seen in his office who suddenly went "crazy" after using a product

10   containing ephedrine.  (RT 1938, 1986.)  Dr. Terrell performed his own on-line research, and based

11   on his research, found that the ingredients in ephedrine can worsen a pre-existing manic depressive

12   illness.  (RT 2034-2036.)  As previously stated, both experts opined that Petitioner suffered from

13   manic depression, was legally insane at the time of the offenses, and that Metabolite played a role in

14   Petitioner's actions.  (RT 1910-1912, 2012, 2036.)  Judging counsel's action, not by hindsight, but

15   by what he did at the time of trial, demonstrates that counsel presented a quite thorough investigation

16   and defense, and the Court finds that counsel's conduct was constitutionally adequate and not

17   deficient.

18        In any event, even if counsel was ineffective for failing to investigate and present the

19   additional research, Petitioner has not demonstrated any resulting prejudice.  First, as argued by

20   Respondent, no blood testing was conducted to determine what level, if any, of ephedrine was in

21   Petitioner's bloodstream.  Without such evidence, Petitioner could not establish that the supplement

22   he took actually contained a significant amount of ephedrine and that he had the substance in his

23   system when he committed the crimes.  Thus, even assuming that consuming ephedrine can result in

24   a psychotic episode, there was insufficient evidence Petitioner consumed a sufficient amount to

25   cause a delusional or psychotic side effect.

26        Second, in turning to the additional research provided by Petitioner, the Disposition of Toxic

27

28

Drugs and Chemicals in Man article, references several cases in which individuals have died.[11] However, it was noted the death was due to chronic use of ephedrine.  There is no evidence that Petitioner engaged in chronic use of the drug.  Although there was evidence that Petitioner consumed Metabolite which contained some level of ephedrine, simply pointing out that some individuals have died from chronic use of the drug, does not necessarily establish a casual connection between Petitioner's ingestion of it and alleged psychotic episode, particularly given that there was no evidence of the level of ephedrine in Petitioner's blood.

The Rand Report,[12] lists several cases in which individuals have reported psychosis due to the ingestion of ephedrine, again, however, it is impossible to determine what level of ephedrine was in Petitioner's bloodstream.  Additionally, even if this additional evidence was admitted at trial, this Court cannot conclude that Petitioner has demonstrated prejudice under Strickland.  The evidence before and relied upon by the trial court in determining that Petitioner was not legally insane would remain unchanged.  That is, Petitioner's actions before, during, and after the crime demonstrated that Petitioner was not experiencing a psychotic episode at the time of the crime.  Rather, his methodical and intentional actions demonstrated otherwise.  Petitioner has failed to demonstrate a reasonable probability that the result would have been different.  As asked and answered by Dr. Howsepian even assuming Petitioner was in a manic state when he committed the crimes, Petitioner still understood the nature and quality of his acts and knew right from wrong.  (RT 2554.)  He stated that it is not true that aberrant conduct must be caused by a psychotic episode; stresses can cause a person to behave out of character without the person being in a psychotic state.  (RT 2556.)

In his traverse, Petitioner points to additional articles and contends that Dr. Howsepian's testimony was directly contradicted by the FDA studies.[13]  Petitioner points to Dr. Howsepian's testimony that "we don't know" whether people with a manic disorder are more prone to the effects

---

[11]  See Appendix 2, attached to Dr. Globus's declaration; Lodged Doc. 6.

[12]  Rand Report, Ephedra and Ephedrine for Weight Loss and Athletic Performance Enhancement: Clinical Efficacy and Side Effects, issued February of 2003, at http://www.fda.gov/oc/initiatives/ephedra/february2004/, at 99-101.

[13]  For the reasons explained herein, because the Court has found no prejudice under Strickland, these articles need not be evaluated further.

of ephedrine. (RT 2411.) Dr. Howsepian stated that Metabolite contains about as much caffeine as a cup of tea. (RT 2413.) Dr. Howsepian further stated that even if Petitioner is "exquisitely sensitive" to the effects of ephedrine, it could not account for a psychotic reaction, which Petitioner contends is directly contradicted by the FDA studies. (RT 2414) However, Dr. Howsepian opined that even assuming Petitioner was in a manic state when he committed the crimes, Petitioner still understood the nature and quality of his acts and knew right from wrong. (RT 2554.) Specifically, with regard to Metabolite, Dr. Howsepian opined as follows:

> Q      How would you contrast your evaluation of the influence of Metabolife in this case to the opinions expressed by Dr. Estner and Dr. Terrell?
> A      Well, Dr. Estner and Dr. Terrell strongly suggested, or opined, that somehow this supplement played a central role in something like a manic episode or a psychotic episode or delirium or something like that. And I don't see any evidence for those kinds of psychiatric sequelae to this herbal supplement.
>
> What is most remarkable from my looking at the case, from the point of view of the witnesses, is that Mr. Schoenhoeft was highly deliberate, was very organized - - there wasn't any hint - - this is before the crime itself. Afterwards, things were quite different. So we will partition this discussion to two parts.
>
> Before the actual crime, and in the process of committing the crimes, he was very deliberate, very purposeful, very much in control of himself and the situation. He exhibits no kind of psychiatric disorganization, no disorganization of his speech or this behavior. Things that you must see, it seems to me, to say that someone is either manic or psychotic, in the sense that it's in question, is a psychosis connected it to some kind of mania, so somehow - - or delirium. People with those kind of episodes are very disorganized, they're disorganized conceptually, disorganized in their behavior, disorganized in a way that wasn't at all reflective in how the witnesses accounted for these events leading up to and including the sexual assault.
>
> So that - - in that sense, I mean, there is just no evidence for those kinds of diagnostic considerations. The only evidence that one can point to is the fact that this event happened, it was kind of an aberration. But that itself isn't enough. And there is - - there must be certain surrounding kinds of symptoms, behaviors that we just don't see.
>
> So I'm fairly confident that that - - that there's not a kind of manic episode *with or without psychosis or a delirium that was caused by this supplement in this case.*
> Q      As I understand in their testimony, they felt that the possible aggravated effects of this compound were keyed to their diagnosis of him as being - - as having a bipolar disorder.
> A      Right.
> Q      That it was - - that people with that disorder would be more prone to aggravated effects of this compound.
> A      Yeah. And we don't know whether that is true or not. Let me just say a couple things about ephedrine, at least, as - - and the central ingredients of Metabolife. Ephedrine is a very complicated chemical compound that has what we call four isomers, four different kinds of chemical types. Because of the peculiarities of the compound atoms in that chemical, you can get four different kinds. And two of those chemical types are isomers of ephedrine, are very closely related to Dextroamphetamine, okay.
>
> Dextroamphetamine can, we are pretty certain - - we have a number of cases out there - - can cause someone to become manic, whether or not they have a prior history of bipolar disorder. It is also used to treat mania, in some cases. There are some cases in the literature of patients responding well to treatment with Dextroamphetamine for mania. And I can get those references for you, if you would like.

56

1   So it is one of these drugs - - and there are others - - this is an illicit for this drug.  If it were in this case being abused, you'd typically tend to see these kinds of more florid
2   kind of side effects.  But there are prescription medicines we now have, for disorders, one which was recently FTA approved for that, called Olanzapine, . . ., which also has this very
3   peculiar property.  It can be used to calm manic patients and it can also induce mania in certain patients.
4   So what precisely the role of ephedrine - - you know, how to understand that, in this kind of context, it is hard to know.  All we have, again, are certain verbal reports of what was
5   felt before his memory gave way and then a very clear, deliberate series of events that couldn't - - it seems to me couldn't be the product of a manic kind of behavior, or a mania
6   with psychosis or delirium.
    Q      Well, you have also mentioned the amnesia involved here.  Did you - - did you
7   attempt to evaluate the nature and extent of this amnesia in Mr. Schoenhoeft?
    A      Yes, I did.
8   Q      Before we go any further, is there anything else that you can enlighten us on about the possible impact of Metabolife here?
9   A      Let me say a few things about that.  Sure.  One is, Metabolife also has enough caffeine in it, and if I'm not mistaken, it is something less than 40 milligrams or less than 50
10  milligrams of caffeine per consolute.  I can't recall precisely.  But that is the amount of caffeine in a cup of tea.  And the average American has about 200 milligrams of caffeine a
11  day.  That is how much they ingest.  A good cup of coffee is about 100 milligrams.  So we're not talking about a lot of caffeine.
12  The ephedrine itself, even if it did have the kind of stimulant properties that approximated what Dextroamphetamine would do, we know it is less potent, at doing that, it
13  is a less potent stimulant than Dextroamphetamine is.  So we're not talking here about a very potent concoction of stimulants, but be that as it may, some people are exquisitely sensitive.
14  And in fact, Mr. Schoenhoeft is probably one of those people, because at least from his report, the only time he has ever stayed up all night long, maybe even for two nights, he
15  said two nights or two days - - he is not clear if that is one night or two days or what - - was after drinking a cup of caffeinated coffee.  And that is why he doesn't drink regular, old,
16  strong coffee any more.
    So he certainly could be vulnerable to even much less potent stimulants than others
17  might.  But the vulnerability seems not to be related to a mania or to a delirium.  It is related to insomnia, feeling nervous, feeling energetic, but not to the degree of meeting criteria for
18  the kinds of disorders that I saw in those reports.  Far from that, actually.
    ..................................................................................................................................
19  Q      Thank you.  Did you have an opportunity to review the information about Mr. Schoenhoeft's sleeping patterns in the days before this incident?
20  A      I asked questions about some of those patterns, but the best I got - - I mean, I didn't get very good information about it.  His wife said, repeatedly, that she is never awake, she
21  sleeps like a log, she doesn't know what is going on much of the time because she just sleeps - - she is a sleeper.  Ans she did say that the day before the events in question, that he didn't
22  complain of not getting a good night's sleep, all right.  That is the most I got from her.  And she said she doesn't really have a good handle on a lot of his sleeping behavior.
23  Now, she does say that there are times when she knows that he can't sleep, he will get up, and he will watch television for a while, eat cookies, or graham crackers, or drink milk or
24  something, and sometimes takes walks and sometimes rides his bike.  So there are times like that that she is clear about.
25  But generally, she said she doesn't know what is happening, because she is just fast asleep.  That is a very important question about what his sleeping was like right before these
26  things happened.  But - - and it would be all the more important, it seems to me, because what we have, as far as descriptions of him, were clear - before the incident was clearly not
27  mania.  This is a quiet, brooding, angry, isolating, withdrawn guy.  That is not mania, that is for sure.  So if there was any mania at all, it would have to have been the next - - the day of
28  the crime itself.

Q       Okay.
A       And there's no evidence from the witnesses at all to suggest anything of that sort. And then, again, afterwards, the more disorganized behavior, all the peculiarities of what happened after the crimes, that speaks more, to my mind, of a kind of dissociative reaction, something that happened - - someone who had done something really horrible, knew it, at some level, and just fragments.

(RT 2410-2417, emphasis added.)  He further stated that it is not true that aberrant conduct must be caused by a psychotic episode; stresses can cause a person to behave out of character without the person being in a psychotic state.  (RT 2556.)

In sum, reviewing Dr. Howsepian's testimony as a whole demonstrates that although Dr. Howsepian recognized that the research was limited with regard to whether individuals with a preexisting mental condition are more prone to the effects of ephedrine causing psychosis, he acknowledged that even if it did, Petitioner simply was not operating under a psychotic state before, during, or after the offense in question.

Furthermore, even assuming this evidence was presented and it established a link to psychosis, there is not a reasonable probability that the outcome would have been different.  The trial court specifically found that Petitioner suffered from manic depression; however, based on his conduct surrounding the offense it simply could not be said that he did not know right from wrong. Under California law, a person may be mentally ill or mentally abnormal and yet not be legally insane.  People v. Kelly, 1 Cal.4th 495, 535 (1992).  The Court finds that the same finding would have been rendered in the face of evidence establishing that ephedrine caused, in some individuals, psychosis.  Accordingly, Petitioner has not, and likely cannot, demonstrate prejudice under Strickland.

D.       Ineffective Assistance of Counsel During Guilt Phase of Trial

Petitioner contends that trial counsel was ineffective for failing to present evidence of insanity during the guilt phase of his trial.  More specifically, Petitioner contends that the defenses of unconsciousness, involuntary intoxication, absence of specific intent due mental illness, and absence of specific intent due to intoxication, should have been presented.  Petitioner submits that had the defenses been presented, "there exists a reasonable likelihood that these defenses would have at least raised a reasonable doubt in the mind of the trier of fact."

Under California law, if a defendant pleads not guilty, along with a plea of not guilty by reason of insanity, the issues of guilt and sanity are tried separately.  People v. Hernandez, 22 Cal.4th 512, 520 (2000).  The guilt phase proceeds first, and the defendant is conclusively presumed to have been sane at the time the offense was committed. § 1026(a).  If the defendant is found guilty, then the trier of fact must determine whether the defendant was sane or insane at the time the offense was committed.  Id.; People v. Hernandez, 22 Cal.4th at 520.

Evidence presented during the guilt and sanity phases of the trial may overlap.  Id.  During the guilt phase, the defendant may present evidence demonstrating that he lacked the requisite mental state required to commit the charged crime.  Id.; People v. Saille, 54 Cal.3d 1103, 1111-1112 (1991); §§ 21, 28, 29.  Thus, evidence may be presented in an attempt to demonstrate that the defendant did not form the requisite intent for the crime due to mental illness, unconsciousness, or intoxication. People v. Smithey, 20 Cal.4th 936, 969 (1999).

Although evidence may be introduced to demonstrate a mental illness, an expert at the guilt phase may not offer an opinion as to the ultimate determination of whether the defendant did or did not have a particular mental state at the time he committed the offense.  People v. McFarland, 78 Cal.App.4th 489, 496 (2000); People v. Smithey, 20 Cal.4th at 960-961; People v. Coddington, 23 Cal.4th 529, 582 (2000).

In rejecting Petitioner's claim on direct appeal, the Fifth District Court of Appeal initially stated:

> The record strongly infers that defense counsel went to trial having made specific tactical decisions as to manner and presentation of evidence.  His statements at the posttrial hearing seem to reflect his own second-guessing given the trial court's acknowledgment at the sanity phase that [Petitioner] suffered from manic depression.
> In any event, we will address the potential applicability of the unconsciousness and intoxication defenses, and conclude that defense counsel was not prejudicially ineffective and it is not reasonably probable that a different result would have occurred if the psychiatric evidence had been presented at the guilt phase.

(Lodged Doc. No. 4, at 58.)

In finding that any potential defense at the guilt phase of Petitioner's trial would have been limited to unconsciousness as a result of his manic-depression and alleged psychotic episode or involuntary intoxication causing unconsciousness, the Fifth District Court of Appeal held:

59

        In the instant case, [Petitioner's] purported defense theory could have been based on unconsciousness, as the result of his manic-depression and the alleged psychotic episode. [Petitioner's] purported defense theory could have also been based on involuntary intoxication, given his inferential claim that he voluntarily ingested the Metabolite pills but didn't know the pills contained ephedrine, and the ephedrine triggered the psychotic episode which resulted in the commission of the instant offense. Thus, the possible intoxication claim in the instant case would have been limited to one of involuntary intoxication causing unconsciousness. [Citations.]

        However, there is an evidentiary problem as to [Petitioner's] attempted reliance on the Metabolite causing his alleged involuntary intoxication and unconsciousness. There is no dispute that [Petitioner] ingested the pills and that such pills contain various stimulants, including ephedrine, ginseng, and caffeine. Both the prosecution and defense experts examined the bottle retrieved from [Petitioner's] possessions, and agreed [Petitioner] probably ingested about one-third of the bottle for 10 days or two weeks prior to the instant offenses. There was no evidence as to the amount of ephedrine in [Petitioner's] body, and the defense experts noted the emergency medical treatment [Petitioner] received after the accident would have prevented accurate results. However, there was no evidence as to the actual contents of the pills in that bottle. There was no evidence as to the amount of ephedrine contained in the pills ingested by [Petitioner], or whether there was enough ephedrine to actually trigger a psychotic episode. . . . Given the absence of such critical evidence, we cannot conclude on the record before us that defense counsel was prejudicially ineffective for failing to rely on the Metabolite to raise the defense of involuntary intoxication. [Citation.]

        [Petitioner's] claim of unconsciousness would have been based on the psychiatric evidence of his manic depression, and the experts' opinions that he flipped into a psychotic episode when he committed the offenses. While the trial court accepted the general consensus that [Petitioner] suffered from manic depression, the court could not ignore the overwhelming evidence of [Petitioner's] purposeful planning over the space of several days. When [Petitioner] and his family left Reno on Wednesday, he brought along his black vest from his security uniform. He also brought along his handcuffs and badge, and his black-webbed uniform belt. [Petitioner] admitted the black vest had been stored in the basement since he quit his security job at the casino, but claimed he might have grabbed the vest when he collected his winter parka from the same basement storage area. [Petitioner] claimed he usually brought along his nine-millimeter handgun for his family's safety on long trips, but admitted the gun was kept unloaded and the ammunition clips were in another bag. [Petitioner] also claimed the latex gloves and condoms were stored with other medical supplies in the van's first aid kit, but he admitted that these items happened to be placed together in his zippered bag when he committed the instant offenses. Finally, [Petitioner] was unable to explain how or why he removed the rear license plate from the van.

        [Petitioner] planned and executed a methodical scheme to lure two young boys from the playground, kidnap and restrain them in his van, commit the sexual molestations, and threaten them if they accurately described him to the police. The record infers he was going to return the boys to the general vicinity of the school but missed the street. When he stopped for directions, Mr. Amezquita and Mr. Vallejo, the two "Good Samaritans," finally caught up with him and tried to prevent his escape. [Petitioner] rapidly backed his van directly into the path of Amezquita's sedan and fired four shots, point blank, into the front driver's side of the vehicle. The shots narrowly missed the occupants but shattered the windows. [Petitioner] escaped and left the boys on the side of the road, but stopped at various location[s] and threw his gun, the handcuffs, and other incriminating evidence out of his van as he continued his escape. Indeed, the officer who followed [Petitioner] in the helicopter thought he was either trying to perform a U-turn or escape detection when he drove off the side

60

of the road and into the ravine.

As the trial court noted, [Petitioner] engaged in a methodical operation in which he disguised himself as a law enforcement officer to facilitate the kidnapping of the boys from the playground.  While [Petitioner's] experts insisted that he could have committed such purposeful acts in the course of a psychotic episode, the overwhelming evidence belied that claim given the careful steps [Petitioner] engaged in to kidnap the boys, commit the sexual molestations, and attempt his escape through violence.  Even if defense counsel had presented the psychiatric evidence at the guilt phase, it is not reasonably probable that the court would have relied on such evidence to find a complete defense or negate his intent based on unconsciousness.  [Petitioner's] purposeful behavior, which started on Wednesday and continued until he realized he was being chased on Saturday afternoon, failed to establish that he was not conscious of his conduct when he committed the offenses.

(Lodged Doc. No. 4, at 60-65.)

During the sanity phase of the trial, the trial court specifically found that Petitioner suffered from manic depression, however, the court found that Petitioner's calculated and intentional acts leading up, during, and following the offense, demonstrated that Petitioner was not legally insane at the time of the offense.  Thus, this Court cannot say there is a reasonable probability that the outcome of this case would have been affected had trial counsel presented evidence of Petitioner's insanity during the guilt phase of the trial.  Stated differently, even if counsel had presented the same evidence from the sanity phase at the guilt phase of the trial, including the further research presented by Dr. Globus, the trial court could, and likely would, have reached the same conclusion.  The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The petition for writ of habeas corpus is DENIED; and

2.      The Clerk of Court shall enter judgment in favor of Respondent.

IT IS SO ORDERED.

Dated:   **July 30, 2007**               **/s/ Dennis L. Beck**
                                          UNITED STATES MAGISTRATE JUDGE